## Case No. 14,866.

### UNITED STATES v. COPPER STILL.

[See Case No. 15,928.]

## Case No. 14,867.

### UNITED STATES v. CORNELL.

[2 Mason, 60.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1819.

COURTS — FEDERAL JURISDICTION — MILITARY POST — CONSENT OF STATE LEGISLATURE.

1. The purchase of lands by the United States for public purposes, within the territorial limits of a state does not of itself oust the jurisdiction or sovereignty of such state over such lands, so purchased.

[Cited in Lee v. Kaufman, Case No. 8,191; Ft. Leavenworth R. Co. v. Lowe, 114 U. S. 533, 5 Sup. Ct. 999; Woodfin v. Phœbus, 30 Fed. 297; U. S. v. Penn, 48 Fed. 670.]

[Cited in Foley v. Shriver, 81 Va. 572; Ft. Leavenworth R. Co. v. Lowe, 27 Kan. 762; People v. Collins (Cal.) 39 Pac. 17.]

2. Exclusive jurisdiction is the necessary attendant upon exclusive legislation.

3. The constitution of the United States declares that congress shall have power to exercise "exclusive legislation" in all "cases whatsoever," over all places purchased by the consent of the legislature of the state in which the same shall

1 [Reported by John A. Hayward, Esq., and George C. Hazleton, Esq.]

1 [Reported by William P. Mason, Esq.]

be, for the erection of forts, magazines, arsenals, dock yards, and other needful buildings. When, therefore, a purchase of land for any of these purposes is made by the national government, and the state legislature has given its consent to the purchase, the land so purchased, by the very terms of the constitution, ipso facto, falls within the exclusive legislation of congress, and the state jurisdiction is completely ousted.

[Cited in U. S. v. Davis, Case No. 14,930; U. S. v. Ames, Id. 14,441; Ex parte Tatem. Id. 13,759; U. S. v. Meagher, 37 Fed. 877; U. S. v. Penn, 48 Fed. 670; Ft. Leavenworth R. Co. v. Lowe. 114 U. S. 533, 5 Sup. Ct. 999.]

[Cited in Lasher v. State (Tex. App.) 17 S. W. 1065; Re O'Connor. 37 Wis. 380; People v. Collins (Cal.) 39 Pac. 17; Sinks v. Reese, 19 Ohio St. 318; State v. Pike. 15 N. H. 91; In re Stephens, 4 Gray, 560. Cited in brief in Teall v. Felton, 1 N. Y. 542; Re Town of Highlands (Sup.) 22 N. Y. Supp. 138.]

, Indictment [against William G. Cornell] for the murder of one William Kane in Fort Adams in Newport Harbor, alleged to be a place within the sole and exclusive jurisdiction of the United States.

At the trial of the cause, the prisoner having pleaded not guilty, it appeared in evidence, that the prisoner was placed on post at 8 o'clock in the evening of the 4th day of July, 1819, and remained on post until relieved by a guard at 10 p. m. of the same night. He was then returning with another soldier (composing, with himself, the relieved guard) under the direction of a corporal, to his quarters, having his musket in his hand, which was loaded according to the common usage, with a ball and three buck shot. As the relieved guard passed along the quarters of the soldiers, the deceased was standing in the door-way of his quarters leaning against the side of the door-frame and laughing; and when the relieved guard had passed a rod or two beyond him, the deceased stepped out of the door-way about a yard, stooped down and took up a handful of gravel, advanced a yard, and carelessly pitched it (to use the expression of a witness), but not with great violence, at the guard; quarrelsome words immediately ensued, and the corporal, who was a little in advance of the relieved guard, said, "Don't make a noise there, come along;" and as he turned round to see what the matter was, the gun flashed; and upon going up to the spot, he found the deceased mortally wounded; and the prisoner upon being asked if he had shot him, answered, "Yes, by God; I hope I have." He also admitted that he had done the act on purpose. The deceased died in a minute or two; and from the time when the gravel was first thrown, to the firing of the gun was so very short a time, that it seemed almost instantaneous. The prisoner appeared to be in a great passion, and was conveyed to the guard-house, where he expressed himself with considerable rage, and upon being told that he had killed the deceased, said among other things, "I don't care a damn, I hope I have." The soldiers at this time appeared greatly exasperated at him. The size of the gravel which was thrown did not appear, but it was testified that the gravel about the spot where the occurrence took place was from an ounce weight in size, to a very small size. It did not appear that there was any injury to the prisoner by the throwing of it. There was some evidence of a previous quarrel, ten or twelve days before, between the prisoner and the deceased, in which the prisoner threatened to kill the deceased the first chance he could get. But it appeared that the parties were then in a high passion, and were good friends afterwards, living in the same quarters. There was also evidence that the soldiers in the garrison had received an extra gill of rum that day, being the customary allowance on the celebration of Independence. But there was no evidence that they were intoxicated. The prisoner was proved to be illiterate, and badly educated, and to be of an irascible temper.

Rivers & Correns were counsel for the prisoner; and the defence at the trial turned mainly on the following points:

(1) That the place where the offence was committed was not under the sole and exclusive jurisdiction of the United States, and therefore the court had no jurisdiction. The argument on this point is fully stated in the charge of the court.

(2) That the petit jury were not duly returned and impannelled. The ground of this objection was, that sixteen jurymen were summoned from the county of Newport, where the offence was committed, on a day of the term previous to that in which the indictment was found by the grand jury, whereas the counsel contended that the venire for this purpose, under the twenty-ninth section of the judicial act of 1789, c. 20 [1 Stat. 88], should not have been until after the prisoner had pleaded. But the court instantly overruled this objection, as forming no part of the issue on trial before the jury, leaving the objection, which they thought of little weight, to be moved afterwards on a motion for a new trial, if the counsel should think there was any thing in it.

(3) That the trial under the same section of the judicial act of 1789, ought to have been in the county of Newport; but the court overruled this objection also, for a similar reason, and for this further reason, that no application had been made to the court for this purpose, either by the prisoner or the United States.

(4) That the offence committed by the prisoner amounted to manslaughter only—and not to murder, and the counsel argued very much at large on this point, and cited the following authorities: 4 Bl. Comm. 191, 192, 357; Gill, Ev. (Lofft.) 738, 780, 740; 1 Hale, P. C. 455, 456, 499, 465; Foster, Cr. Law, 290, 240, 292; 2 Ld. Raym. 1296, 1492; 1 Hawk. P. C. 192; 5 Burrows, 2796; 1

East, P. C. 236, 244. 760, 87; 1 Hawk. P. C. p. 425, § 36; Co. Litt. 282; 1 Esp. 312; [Respublica v. De Longchamps] 1 Dall. [1 U. S.] 114.

Mr. Robbins, for the United States, contested all the points, and on the last point cited, in addition to the other authorities, 4 Bl. Comm. 195, 198, 199.

STORY, Circuit Justice, in summing up to the jury, said: The first question for the consideration of the jury, is, whether the offence is proved to be committed as alleged in the indictment, in a place within the sole and exclusive jurisdiction of the United States. If so, then the crime falls within the prohibitions of the third or seventh section of the act of 1790, c. 9 [1 Stat. 112], and is clearly cognizable by this court; if otherwise, then the jurisdiction entirely fails, and it is quite immaterial to us, what other court possesses jurisdiction. It is completely proved by the evidence, that Fort Adams, the place in which the offence was committed, is the property of the United States, having been duly purchased by the president more than nineteen years ago, under the authority of an act of congress (as we shall presently see), and ever since exclusively possessed by the United States. Copies of the deeds are now before us, and their sufficiency to pass the fee of the lands is not now disputed. But although the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction of sovereignty of such state over the lands so purchased. It remains until the state has relinquished its authority over the land either expressly or by necessary implication.

The constitution of the United States declares that congress shall have power to exercise "exclusive legislation" in all "cases whatsoever" over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings. When therefore a purchase of land for any of these purposes. is made by the national government. and the state legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of congress, and the state jurisdiction is completely ousted. This is the necessary result, for exclusive jurisdiction is the attendant upon exclusive legislation; and the consent of the state legislature is by the very terms of the constitution, by which all the states are bound, and to which all are parties, a virtual surrender and cession of its sovereignty over the place. Nor is there anything novel in this construction. It is under the like terms in the same clause of the constitution that exclusive jurisdiction is now exercised by congress in the District of Columbia; for

if exclusive jurisdiction and exclusive legislation do not import the same thing, the states could not cede or the United States accept for the purposes enumerated in this clause, any exclusive jurisdiction. And such was manifestly the avowed intention of those wise and great men who framed the constitution.

We are then to consider whether the United States have authorized this purchase, and the legislature of Rhode Island has given its consent to it. By an act of congress of March 20, 1794, c. 9 [1 Stat. 345], several harbors and ports, and among them, that of Newport, were authorized to be fortified under the direction of the president; and he was authorized to receive from any state, in behalf of the United States, a cession of the lands on which any of the fortifications with the necessary buildings might be erected, or be intended to be erected; or where such cessions should not be made, to purchase such lands, not being the property of a state, on behalf of the United States. The legislature of Rhode Island, in furtherance of this object. by an act passed in the same year (Laws R. I. p. 551), authorized any town or person in the state, by and with the consent of the governor of the state, to sell and dispose of to the president, for the use of the United States, all such lands as should be deemed necessary to erect fortifications upon, for the defence of the port and harbor of Newport, and to execute deeds thereof in due form of law. The act contains a proviso that all civil and criminal processes issued, under the authority of the state, or any officer thereof, may be executed on the lands so ceded, and within the fortifications which may be erected thereon, in the same way and manner as if such lands had not been ceded as aforesaid. The governor of Rhode Island gave his consent in writing to the purchase of the lands in question in due form, by a certificate on the original deeds. The argument of the prisoner's counsel is, in the first place, that the act of Rhode Island contains no cession of jurisdiction in terms, and the consent of the legislature through the governor to the purchase is not a virtual cession of its sovereignty over the place. That argument has been sufficiently considered already, and stands repudiated by the express terms of the constitution. The counsel for the prisoner next contend that the state has retained a concurrent jurisdiction over the place; and, if so, then the averment in the indictment is not supported in point of fact. This leads us to the consideration of the true intent and effect of the proviso already mentioned. In its terms it certainly does not contain any reservation of concurrent jurisdiction or legislation. It provides only that civil and criminal processes, issued under the authority of the state, which must of course be for acts done within, and cognizable by, the state, may be executed within the ceded lands, notwithstanding the cession.

Not a word is said from which we can infer that it was intended that the state should have a right to punish for acts done within the ceded lands. The whole apparent object is answered by considering the clause as meant to prevent these lands from becoming a sanctuary for fugitives from justice, for acts done within the acknowledged jurisdiction of the state. Now there is nothing incompatible with the exclusive sovereignty or jurisdiction of one state, that it should permit another state, in such cases, to execute its processes within its limits. And a cession, or exclusive jurisdiction, may well be made with a reservation of a right of this nature, which then operates only as a condition annexed to the cession, and as an agreement of the new sovereign to permit its free exercise as quoad hoc his own process. This is the light in which clauses of this nature, (which are very frequent in grants made by the states to the United States,) have been received by this court on various occasions, on which the subject has been heretofore brought before it for consideration; and it is the same light in which it has also been received by a very learned state court. Com. v. Clary, 8 Mass. 72. In our judgment it comports entirely with the apparent intention of the parties, and gives effect to acts which might otherwise perhaps be construed entirely nugatory. For it may well be doubted whether congress are by the terms of the constitution, at liberty to purchase lands for forts, dockyards, &c. with the consent of a state legislature, where such consent is so qualified that it will not justify the "exclusive legislation" of congress there. It may well be doubted if such consent be not utterly void. "Ut res magis valeat quam pereat," we are bound to give the present act a different construction, if it may reasonably be done; and we have not the least hesitation in declaring that the true interpretation of the present proviso leaves the sole and exclusive jurisdiction of Fort Adams in the United States.

As to the law applicable to the merits of the case, although a great variety of cases have been cited, some of which are of great and some of very little authority, yet the doctrine for the deliberate consideration of the jury lies within a narrow compass. It is conceded on all sides that the prisoner's offence, at least, amounts to manslaughter. Whether it amounts to murder depends upon the point whether the act was done "with malice aforethought." Now the legal notion of malice is not confined to cases where the crime has been committed in cool blood, with deliberate cruelty, and in execution of a settled design; as where a person deliberately plans the destruction of another by assassination or poisoning. But it includes also all cases of homicide, however sudden, which are attended with such cruel circumstances as are the ordinary symptoms of a wicked, depraved and malignant spirit, or, (to use the language of Sir Michael Foster,) with such circumstances as carry in them "the plain indications of a heart regardless of social duty, and fatally bent on mischief." Foster, Cr. Law. 257. It is not therefore every trivial provocation which in point of law amounts to an assault, or even a blow that will reduce the crime to manslaughter. If the punishment inflicted by the party killing be outrageous in its nature or continuance, and beyond all proportion to the offence, it is rather to be attributed to the effect of a brutal and diabolical malignity, the genuine malice of the law, than of human frailty; and therefore the crime will amount to murder in such cases, notwithstanding the provocation. 1 East, P. C. 234. Nor is it any legal extenuation of the offence, that the party killing is very irritable and easily excited to the most ungovernable passion by slight provocation. These are the common attendants upon a cruel and revengeful disposition. There must be a reasonable provocation, such as would awaken passion in reasonable men, before the law will hold the party in any degree excused on the score of human infirmity. Such is the case of offering indignity to a man's person, by pulling him violently by the nose.

In cases, too, of homicide upon provocation, much depends upon the instrument employed, and upon the manner of chastisement. If the instrument be such in its nature as is likely to endanger life, as a sword or a musket, and the provocation be slight, and death ensue, the party killing will be guilty of murder. Much more will it be murder, if in such case the party killing shoot at the other with intent to kill. But if the instrument be not of a deadly nature, nor used with brutal violence; but the chastisement may be fairly attributed to an intention to correct and not gratify a cruel and malignant spirit of revenge, the crime will amount only to manslaughter. 1 East, P. C. 235.

These are the material principles of law, which I deem it necessary to bring to the consideration of the jury. If upon weighing the facts they are satisfied that there was not a reasonable provocation in the present case, but that it was slight, and the punishment utterly disproportioned to the offence; if they are satisfied that the party was stimulated by a malignant spirit of revenge, and diabolical fury, and sought the life of the deceased with brutal passion, having received no injury that ought to provoke a reasonable man to such an act, then the prisoner is guilty of murder—if otherwise, then he is guilty of manslaughter only.

Verdict, guilty of murder.

A motion was made for a new trial, and the motion was argued at June term, 1820, at Newport, and the opinion of the court delivered thereon. [The motion was overruled and sentence of death pronounced. Case No. 14,868.]