No. 18,970.

BOARD OF COUNTY COMMISSIONERS OF ARAPAHOE COUNTY,
ET AL. *v.* HESTER DONOHO, ET AL.
(356 P. [2d] 267)

Decided October 31, 1960

322

Mr. J. Sherman Brown, Mr. Robert J. Flynn, for plaintiffs in error.

Mr. Duke W. Dunbar, Attorney General, Mr. Frank E. Hickey, Deputy, Mr. Gail F. Ouren, Assistant, Mr. John E. Bush, Assistant, for defendant in error State Board of Public Welfare.

Mr. Fred A. Rehmer, for defendant in error Hester Donoho.

*En Banc.*

Mr. Justice Doyle delivered the opinion of the Court.

The question presented on this review is whether one who resides on a military reservation, in this instance Fort Logan, which is wholly within the geographical boundaries of Arapahoe County, Colorado, is entitled to receive benefits under the relief program which is called "Aid to the Needy Disabled." The plaintiffs in error, the County Commissioners, and the Board of Public Welfare of Arapahoe County, have refused to recognize that a resident of this military reservation has any such right and instituted this action naming the claimant, together with the State Board of Public Welfare, as defendants, seeking a declaratory judgment with respect to the question posed.

The pertinent facts, all of which were stipulated, show in substance the following:

Fort Logan is a military reservation. It has had this status since June 14, 1887, having been ceded by the State of Colorado, C.R.S. '53, 142-1-22, 24. Reserved by the terms of the statute was the right to serve criminal and civil process. Mrs. Donoho, the claimant herein, a civilian resident of Fort Logan, made her application on April 15, 1955, for assistance under the "Aid to Needy Disabled" program. On May 2, 1955, the County Welfare Board, composed of County Commissioners, denied her claim on the ground that she did not satisfy the requirement of residence within the county. The program was then being administered under rules and regulations promulgated by the State Board of Welfare. Later, in 1957, a regulatory statute was enacted, C.R.S. '53, 119-6-1 (Cum. Supp.).

Following the Board's denial of her claim, Mrs. Donoho appealed to the State Board of Public Welfare. Hearing was held on October 10, 1955, and the State Board determined Donoho to be a resident and found that she was in other respects qualified. It ordered the County Board to grant the aid in accordance with the application. However, the County Board refused to comply with this directive and when the State Board threatened to bring mandamus proceedings the County Board instituted the present declaratory judgment action in the district court. Defendants then counter-claimed, seeking a mandamus to compel payment of the benefits. The district court upheld the State Board and concluded, *first,* that the plaintiffs had standing to bring the action and, *second,* that the statutory requirement of residence required only that the person be an inhabitant of the county — not that he or she had to be a domiciliary.

The record fails to disclose whether the court considered the questions now presented, that is, whether Article I, Sec. 8, Clause 17 of the United States Consti-

tution prohibited the payment of relief to an individual in the position of the present claimant.

The parties stipulated that Mrs. Donoho was qualified in all respects. However, the County Board maintains that she was not, under the facts disclosed, a resident of the county.

It was revealed in the agreed statement of facts:

"That the United States of America has receded certain of its sovereign rights over the Fort Logan Military Reservation back to the State of Colorado."

The extent of this receding of rights is not revealed. Consequently the question must be determined on the basis that the federal government has all of the powers that are normally acquired as a result of an unqualified ceding of jurisdiction which is usually incident to creation of a military reservation within a state.

In the statute enacted in 1887, the legislature of the State of Colorado authorized the cession of six hundred and forty acres to the government of the United States as the site for a military post later called Fort Logan, under terms whereby the governor would:

" * * * fully cede, give, grant, transfer, confer and confirm exclusive jurisdiction for all purposes whatsoever, over such tract of land, and all and every part thereof, unto the United States of America; but nevertheless, therein reserving to this state jurisdiction to serve the civil process of state, county and municipal courts and tribunals within said tract of lands; to serve and execute therein processes in criminal cases by state, county and municipal officers in respect to offenses, misdemeanors, crimes and felonious acts committed outside of said tract, * * * " C.R.S. '53, 142-1-22. The deed was signed on June 14, 1887, giving the United States "exclusive jurisdiction for all purposes whatsoever" over the area with the reservation of the right to serve civil and criminal process within the area. The deed went beyond the language of the statute in that it contained an additional provision that any property on the post should remain

"released and exempt from all tollages, taxes and assessments of every name and nature for and during the time the United States shall remain the owner thereof." In 1909 the legislature authorized the sale to the United States of an additional tract of land to enlarge Fort Logan. The statute, C.R.S. '53, 142-1-24, states that " * * * exclusive jurisdiction is ceded thereover for all purposes whatsoever * * * " with the exception of the right to serve civil and criminal process within the area. Although the Constitution speaks of "purchase," the decisions have considered the cession by a state of "exclusive jurisdiction" as creating the same relationship as if there had been a purchase. See the annotation in 74 L. Ed. 761, 766.

We are uncertain from a reading of the record whether the federal land in question was acquired by the United States by purchase with the consent of the state under which circumstances it would be squarely within the term of Article I, Section 8, Clause 17, Constitution of the United States, or whether it was merely ceded by the state as a result of which the exclusive jurisdiction would arise from the terms of the conveyance. See *James v. Dravo Contracting Co.*, 302 U.S. 134, 147. We do not, however, consider this factor determinative in the present case since there were no substantial reservations of jurisdiction on the part of the state and the case can be treated as one arising under Clause 17, supra, so as to give maximum recognition to the county's contention.

The position of the County Board is that where territory is ceded to the federal government it thereby is placed under exclusive federal jurisdiction and that the legal consequence of this is disqualification of a person residing within the boundaries of the ceding territory for these reasons:

1. The exclusive jurisdiction of the federal government over federal territories in the absence of reservation by the state operates to preclude the state from

conferring any such benefits. They rely on Article I, Section 8, Clause 17 of the Constitution of the United States.

2. That Donoho is not a resident entitled to relief within the meaning of Colorado statutes; that the County Commissioners are prohibited by the laws of Colorado from paying out public funds to one who is not a resident.

These are questions of first impression in Colorado and elsewhere. No decision which can be regarded as precedent has been cited to us and we have been unable to discover a case which treats the precise issues raised on this review.

I.

*The question whether proper procedure was followed.*

■ Defendants in error claim that the trial court had no jurisdiction to entertain the declaratory judgment action as such — that the proper procedure would have been for the County Board to file its complaint in the nature of certiorari under Rule 106 (a) (4), R.C.P. There is no statutory provision on this subject. No doubt it would have been more appropriate for the County Board to have called its complaint certiorari. Inasmuch, however, as the issue is a narrow legal one — whether the State Board exceeded its jurisdiction in ordering the payment of the relief — we do not consider the point substantial. The County Board undoubtedly proceeded as it did in order to pinpoint the single legal issue raised. For these reasons the matter must be determined on its merits.

Before proceeding to the determinative question, it is to be noted that the United States government is not raising the issue of invasion of its sovereignty. Instead the county is wrapping itself with the federal mantle and arguing that to pay the claimant the relief money would constitute invasion of federal sovereignty. Although we do not predicate our decision on whether the county has a right to invoke this federal protection, we

call attention to the fact that the matter does not involve a serious invasion of federal sovereignty about which the federal government is complaining. Cf. *Stockman v. Leddy*, 55 Colo. 24, 129 Pac. 220, and 11 Am. Jur. *Constitutional Law* §117.

## II.

*The question whether Article I, Section 8, Clause 17 of the United States Constitution operates to prevent or preclude the payments which the county has refused to make.*

The pertinent clause of the federal constitution provides:

" (The congress shall have power: )

" (17) To exercise exclusive legislation in all cases whatsoever over such district (not exceeding ten miles square) as may by cession of particular states, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased, by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards and other needful buildings; and"

The decided cases do not support the county's contention that the purchase or the cession of territory creates a unique and unreservedly exclusive sovereignty within the federal enclave.

■ The history of the adoption of Clause 17 would indicate a desire on the part of the framers to insure uninhibited federal regulatory power within the borders of these federal islands. This is expressed in 1 Federalist and Other Constitutional Papers 240 (Scott ed. 1893), the comments of James Madison.

"The necessity of a like authority over forts, magazines, etc., established by the General Government, is not less evident. The public money expended on such places, and the public property deposited in them, require that they should be exempt from the authority of the particular State. Nor would it be proper, for the

places on which the security of the entire Union may depend, to be in any degree dependent on a particular member of it. All objections and scruples are here also obviated, by requiring the concurrence of the States concerned, in every such establishment."

Also, in 2 *Story, On the Constitution* 128, Sec. 1220, the historical circumstances surrounding the adoption of this clause are described. The author points out that while the Congress was quartered in Philadelphia it had suffered indignities at the hands of local citizens. The Pennsylvania authorities refused to protect the members against these indignities and from this it was clear that the national government would have to have police regulatory control within federal areas. The author also points out in Section 1220, supra, that there was much debate about this clause and that it was adopted with some reservation and reluctance and only because of the necessity to have federal power for the purpose of keeping the peace.

Numerous interpretative decisions have upheld the right of the federal government to impose police regulations and have restrained the power of the state here and in the taxing areas. Thus in *U.S. v. Cornell*, 25 Fed. Cas. 646 (No. 14,867) (C.C.D.R.I. 1819), a criminal case, it was held that the state was powerless to prosecute violators on the federal enclave. To the same effect is *U.S. v. Unzeuta*, 281 U.S. 138 (1930). It has also been held that a state may not tax property which is located on a federal enclave (over which the federal government exercises exclusive jurisdiction), *Surplus Trading Co. v. Cook*, 281 U.S. 647 (1930). Efforts by a state to impose penalties for failure to deliver a telegram within the area of a federal enclave fail. *Western Union Telegraph Co. v. Chiles*, 214 U.S. 274 (1909).

The lack of federal responsibility within these areas resulted in recognition at a relatively early time of the doctrine that the state law in force at the time of cession or purchase continues in full force so as to deter-

mine private rights within the territory and thus fill the vacuum which would otherwise exist. *Chicago, R. I. & P. Ry. Co. v. McGlinn,* 114 U.S. 542 (1885), and see *James Stewart & Co. v. Sadrakula,* 309 U.S. 94 (1940).

Other evidence that "exclusive" as here used is not absolute is furnished by holdings of the Supreme Court that a system of dual authority may be created by agreement between the state and federal government. In *James v. Dravo Contracting Co.,* supra, the Court speaking through Mr. Justice Hughes said:

" * * * the terms of the cession, to the extent that they may lawfully be prescribed, that is, consistently with the carrying out of the purpose of the acquisition, determine the extent of the federal jurisdiction."

Concurrent authority may also exist when Congress recedes jurisdiction to the state with respect to particular matters such as taxation and workmen's compensation. See, for example, 4 U.S.C.A. §106, relating to Income Taxes, and 40 U.S.C.A. §290, pertaining to Workmen's Compensation laws. So also the grant of power back to the state may be implied from national legislation. See *Offutt Housing Co. v. County of Sarpy,* 351 U.S. 253.

There are two recent cases which support the view that the term "exclusive" as used in this clause relates to protection of the federal government against state or local conflicting regulations. *Penn Dairies v. Milk Control Commission of Pennsylvania,* 318 U.S. 261; *Pacific Coast Dairy v. Department of Agriculture,* 318 U.S. 285. In *Penn Dairies,* the state statute regulating the price of milk sold to the federal government was upheld on the ground that the military area in question was on land leased from the state. In the *Pacific Coast* case, the Court held that California was precluded from revoking the license of a violator of the state minimum price statute in sales to the government for use in an area ceded to the United States. The majority said that federal authority in this area removed any possibility

of the exercise of state power. Mr. Justice Frankfurter in his dissent said that the clause in question "is not so tyrannical as to preclude in law what common sense requires." On the subject of extent and scope of exclusiveness, the Judge declared:

"The so-called exclusive jurisdiction drawn from the grant to Congress of power to legislate exclusively has, as a matter of historical fact, become increasingly less and less exclusive.

* * *

"Enough has been said to show that the doctrine of 'exclusive jurisdiction' over federal enclaves is not an imperative. The phrase is indeed a misnomer for the manifold legal phases of the diverse situations arising out of the existence of federally-owned lands within a state — problems calling not for a single, simple answer but for disposition in the light of the national purposes which an enclave serves. If Congress speaks, state power is of course determined by what Congress says. If Congress makes the law of the state in which there is a federal site as foreign there as is the law of China, then federal jurisdiction would really be exclusive. But short of such Congressional assertion of overriding authority, the phrase 'exclusive jurisdiction' more often confounds than solves problems due to our federal system."

The opinion of Mr. Justice Murphy also took the position that the clause does not absolutely preclude the state from exercising power not inconsistent with that of the federal government.

■ Neither of the milk decisions are inconsistent with the conclusions that the state, through its agency the county, may extend relief benefits to an American citizen living within the confines of a military enclave.

Plaintiffs in error have cited to us an advisory opinion of the Supreme Judicial Court of Massachusetts in 1841 as a precedent for denying the right of the resident of the federal enclave to claim state welfare benefits. *Opinion of the Justices*, 42 Mass. (1 Met.) 580. In that

opinion the court responded to the question whether residence on a federal enclave would give a person "legal inhabitancy" within a town or the Commonwealth; it construed the phrase "legal inhabitancy" as the equivalent of the requirement of "legal settlement" which was necessary to entitle one to poor relief and stated that such residence would not give a legal inhabitancy within a town or the Commonwealth. The court also stated that residents of federal enclaves "do not acquire the civil and political privileges, nor do they become subject to the civil duties and obligations of inhabitants of the towns within which such territory is situated." These sweeping and abstract statements, coming though they do from a respected court, are not convincing to us in this day when "poor relief" is no longer of parochial concern but a matter of general public interest and in a great measure a cooperative effort of the state and national governments. In particular, we do not deem these statements applicable to a case such as that before us in which the program is paid for in part by the federal government, and designed to conform to its requirements. Moreover, 42 U.S.C.A. 1352 (b) (2) persuades us against the result contended for by the county. This section provides that a state plan may not be approved if it imposes as a condition:

"Any citizenship requirement which excludes any citizen of the United States."

The author of a recent case note reported in 12 *George Washington L. Rev.* 89, 92, said:

"It seems that state laws passed for the public welfare should be applied to federal enclaves within the state, for the state is best fitted to know the requirements of its particular locality and to deal with them. Such measures, it appears, would not interfere with the functions of the Federal Government. The Supreme Court has held that on the contrary they furthered the national interest. In a New York case the state labor law concerning safety precautions was held to apply in

an area subject to exclusive federal jurisdiction since it did not obstruct the performance of the national purpose. The possible slight increase in construction cost to the government that might result because of the precautions was deemed not to interfere."

The case to which reference is made is that of *Stewart v. Sadrakula,* supra, where the action was for damages growing out of an accidental death on a post office site. At the time of the federal acquisition, a New York labor law required the protection of employees on building construction or demolition work. The Supreme Court held that the acceptance of sovereignty by the United States did not have the effect of displacing the New York labor statute — that it continued to be operative.

A note in 101 *Pa. L. Rev.* 124 calls attention to the present tendency to extend the voting privilege to residents of federal enclaves and the grant of the privilege of filing divorce actions in courts. These are analogies supporting our conclusion that Clause 17 does not prohibit conferring of benefits by the state.

Therefore, in view of the fact that "exclusive legislative" jurisdiction does not operate as an absolute prohibition against state laws but has for its purpose protection of federal sovereignty, we conclude that it does not operate to prohibit the payment of relief to a resident of Fort Logan. The conferring of a benefit required by federal law cannot be construed as an act which undermines the federal sovereignty. Indeed by paying relief in these circumstances the federal policy to recognize citizens of the United States is fostered and promoted.

III.

*The final question is whether the County of Arapahoe is precluded by the laws of Colorado from paying benefits to the applicant.*

The final contention is that the county is restricted by C.R.S. '53, 119-1-13, to the administration of welfare programs — that the claimant here does not satisfy this

requirement. Arapahoe implements this argument by pointing out that the funds to support the county contributions to the program originate in a revenue on the assessed valuation of property in the county, and calls attention to the fact that property within the Fort Logan reservation is exempt from property taxes. As a consequence it is contended that the language "in the county" has to be read so as to refer to land in the county exclusive of Fort Logan. In further support of its argument, it is asserted that administration of the program requires various acts such as investigation of applicants and collection of data, and attempts to carry out these functions might well be frustrated by the Fort Logan authorities.

We see no clear conflict between the terms of the state law and the exercise of necessary functions in carrying out the program, in the light of the geographical location of Fort Logan. Perhaps the most persuasive factor in evaluating the contention of possible federal interference is the federal statute, 42 U.S.C.A. §1352 (b), supra. It is illogical to suppose that the federal government would interfere with the county carrying out a program contemplated by federal statute.

In the light of all the foregoing, it is amply clear that the trial court was correct in ruling that the claimant satisfied statutory requirements of residence within Arapahoe County.

Accordingly, the judgment is affirmed.

MR. JUSTICE DAY not participating.