Dear Mr. Wells:
I am in receipt of your request for an Attorney General's opinion on behalf of the Belle Chasse Academy regarding state jurisdiction over the school. You stated that questions concerning subpoenas and access by state OCS workers have arisen and you ask for responses to the following questions:
 1) Can Belle Chasse Academy sue or be sued in state court or must all law suits be filed in federal court?
 2) Are state court subpoenas enforceable onboard the Belle Chasse Academy?
 3) Does a state court have jurisdiction over the person when the person is located onboard Belle Chasse Academy?
 4) Does a State OCS worker have authority to take custody of a child at the school without parental authorization or approval of the base Commanding Officer or his Family Advocacy representative?
 5) Is the Louisiana Public Works Act, La.R.S. 38:2241 et. seq, applicable to school construction projects?
La.R.S. 17:3971 et. seq. creates the Charter School Demonstration Programs Law. There are five types of charter schools in Louisiana. Belle Chasse Academy is a type 2 charter school. A type 2 charter school is an independent public school operated as a result of a charter between a non-profit corporation created to operate the school and the State Board of Elementary and Secondary Education ("BESE").[1] The non-profit corporation that holds the charter for and operates Belle Chasse Academy is Belle Chasse Academy, Inc. Belle Chasse Academy is located on the United States Naval Air Station/Joint Reserve Base New Orleans in Belle Chasse, Louisiana. Upon review of Belle Chasse Academy, Inc.'s charter proposal and charter contract with BESE, it is apparent that Belle Chasse Academy, from an organizational and structural standpoint, is indistinguishable from other type 2 charter schools, except that it is located on a federal military base and primarily enrolls dependent children of military personnel. In addition, La.R.S. 17:3991(B)(1)(a)(ii) creates an exception to the at risk enrollment requirements for charter schools that predominantly enroll pupils who are dependent children of military personnel.
In response to your first question, we note that your opinion request does not reference Belle Chasse Academy, Inc., but rather refers only to Belle Chasse Academy. The charter school law does not identify charter schools as entities independent of the non — profit corporations that operate them. La.R.S. 17:3991(A)(1)(a) provides, "[e]xcept for a Type 4 charter school, a charter school approved and established in accordance with the provisions of this Chapter shall be organized as a nonprofit corporation under applicable state and federal laws." Belle Chasse Academy does not have the legal capacity to function independently of Belle Chasse Academy, Inc. and thus does not have juridical capacity. Therefore, any suits instituted must be on behalf of or against Belle Chasse Academy, Inc.
As a non-profit corporation organized under applicable Louisiana law, Belle Chasse Academy, Inc. has the power to sue and be sued in its corporate name.[2] Suits can be instituted by it or against it in state court and federal court. Actions filed in federal court must meet federal jurisdictional requirements. Belle Chasse Academy, Inc. is a Louisiana non-profit corporation that operates a charter school located on a federal military base. The location of Belle Chasse Academy on the federal military base does not make the school an entity of the federal government.
Prior to our discussion of the jurisdictional issues you raise, we must first make note of a provision of Belle Chasse Academy Inc.'s charter contract with BESE. Paragraph 16 Site Visits provides:
 A. The Charter Operator shall allow representatives from BESE, the Louisiana Department of Education, the Louisiana Legislative Auditor, law enforcement officials, contracted evaluators or any other federal, state or local regulatory agency to visit the school site at any time to insure compliance with all applicable laws and regulations, the terms of this Charter Contract and the terms of state and federal grants.
 B. During such site visits, the Charter Operator shall allow the visiting officials full and immediate access to its financial and educational records, reports, files and documents of any kind.
Belle Chasse Academy, Inc., in order to fulfill this term of its charter contract with BESE, must take steps to ensure that the referenced site visits can be conducted by state and local officials.
The next series of questions you ask involve state jurisdiction over Belle Chasse Academy in light of it being located on a federal military base with exclusive federal jurisdiction. The federal government owns the property on which the United States Naval Air Station/Joint Reserve Base New Orleans is located. The power to establish areas of exclusive federal jurisdiction within the states was granted to Congress by the Constitution. Article I, Section 8, Clause 17 of the Constitution of the United States provides that Congress is empowered
 [t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock- Yards, and other needful Buildings.
The Louisiana legislature has consented to exclusive federal jurisdiction of land acquired within its borders, if the land is used for Art. I, sec. 8, cl.17 purposes. La.R.S. 52:1 provides:
 A. The United States, in accordance with the seventeenth clause, eighth section of the first article of the Constitution of the United States, may acquire and occupy any land in Louisiana required for the purposes of the federal government. The United States shall have exclusive jurisdiction over the property during the time that the United States is the owner or lessee of the property.
* * *
 C. The state may serve all civil and criminal process issuing under authority of Louisiana on the property acquired by the United States.
Areas of exclusive federal jurisdiction are known as enclaves. In enclaves, all legislative authority rests with the federal government, except the power, as retained by the state of Louisiana in La.R.S. 52:1(C), to serve all civil and criminal process.
The United States Supreme Court, in early cases, found that federal enclave jurisdiction excluded all state governmental power.[3] Exclusive federal jurisdiction essentially meant that all judicial, executive and legislative authority was vested in the federal government. In theory, a federal enclave was considered a "state within a state." Various state courts, under this theory, found that residents of enclaves did not have the same rights as citizens of the state. Such rights included the right to receive a state education,[4] the right to vote[5] or the right to obtain a divorce.[6]
The 1953 Supreme Court case of Howard v. Commissioners of SinkingFund of Louisville changed the "state within a state" view of federal enclave jurisdiction.[7] In Howard, the Court permitted the city of Louisville, Kentucky to annex an area of property that was under the exclusive jurisdiction of the federal government and levy a license tax in such area. The Court found that the property, when first acquired by the United States, did not cease to be a part of Kentucky. The Howard court rejected the traditional enclave jurisprudence and adopted a rule of noninterference, which provides that all state laws are valid within federal enclaves unless they interfere with the jurisdiction asserted by the federal government. The Court stated:
 The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal areas within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government. The sovereign rights in this dual relationship are not antagonistic. Accommodation and cooperation are their aim. It is friction, not fiction, to which we must give heed.[8]
Similar reasoning was applied by the Supreme Court in the 1963 case of Paul v. United States, wherein the Court held that the state price regulations were not applicable to sales of milk for strictly military consumption or resale at federal commissaries.[9] The Court reasoned that the state regulations conflicted with federal statutes and regulations governing the procurement of goods for the military with appropriated funds.[10] The Court further ruled that since there was no conflicting federal policy concerning purchases and sales from nonappropriated funds of milk for consumption or resale at federal commissaries and current state price controls over milk were applicable to such sales on federal military bases in the state if the law authorizing the control had been in effect since the time of acquisition of the bases.[11]
Since the Howard and Paul decisions, the Supreme Court and state courts have expanded the rights of enclave residents and recognized that State law and court orders may apply in a federal enclave provided that the state does not interfere with the primary jurisdiction of the federal government. In Evans v.Cornman, the Supreme Court held that enclave residents had the right to vote.[12] State courts have found that enclave residents have a right to run for public office;[13] to receive welfare services;[14] to receive court ordered child protection;[15] and to receive a spousal abuse protective order.[16]
The Louisiana Supreme Court addressed the issue of state regulation of electricity services to a school located on property owned by the United States Government in Beauregard ElectricCooperative v. Louisiana Public Service Commission et al.[17]
In Beauregard, a Vernon Parish School Board elementary school site was physically located on Fort Polk, with Vernon Parish School Board as owner and operator of the buildings. The United States Government, through the Department of the Army, had agreed by lease that the Vernon Parish School Board had permission to place its school on the military installation. The Louisiana Supreme Court found that a Louisiana Public Service Commission General Order relating to duplication of electric services was applicable to the utility companies seeking to provide utility services to the school facility on Fort Polk, despite its location. In so finding, the court relied on Penn Dairies v. Milk ControlCommission of Pennsylvania for its proposition that "federal governmental immunity from state regulation extends to the performance by federal instrumentalities, federal officers, and agents of governmental activities or functions."[18] The court went further to state:
 In Penn Dairies, the United States considered whether the minimum price regulations of the Pennsylvania Milk Control Law could be applied constitutionally to the sale of milk by a dealer to a United States military encampment. In upholding the application of the price regulations, the Court found no "impairment of federal authority." Id., 318 U.S. at 270, 63 S.Ct. at 621, 87 L.Ed. 748 (1943).
* * *
 It follows from the rationale of the Court as expressed in Penn Dairies that in the instance where Congress has not acted to exercise its exclusive jurisdiction in providing certain services, state regulation of an independent contractor who provides such services does not infringe upon federal governmental immunity from such regulation. Following the Penn Dairies reasoning in James Stewart Co. v. Sadrakula, 309 U.S. 94, 60 S.Ct. 431, 84 L.Ed. 596 (1940), state regulation of such an independent contractor is not precluded by the immunity of the federal government, because such a contractor is not a federal instrumentality and thus does not share in the governmental immunity. An exception to this rule would lie where the regulation is in direct interference with the governmental function or some congressional policy.
* * *
 Neither the Vernon Parish School Board nor Beauregard Electric are federal instrumentalities; Vernon Parish School Board is a lessee of the federal government and Beauregard is an independent contractor, a public utility company subject to the jurisdiction of the Louisiana Public Service Commission under the authority granted to it under the laws of our State.
 The mere fact that the school to be owned and operated by the Vernon Parish School Board and to be supplied service by Beauregard has its site on a United States military installation is not by itself determinative of the question of the propriety of the exercise of the Commission's jurisdiction. Beauregard argues that the right of way granted by the Army clearly denotes the exclusive nature of federal jurisdiction over the property, thus barring the Commission's regulation. But the grant of the right of way easement by the United States here should not be construed as an implied exercise of federal control over the operation of a public utility so as to bar the jurisdiction of this state's regulatory body. Furthermore, the grant of the right of way, although perhaps not an express consent to state regulation by the United States Government, does not make the United States a party to the agreement for service between Beauregard and the Vernon Parish School Board.
As previously stated, Belle Chasse Academy is a charter school operating pursuant to a charter between Belle Chasse Academy, Inc. and BESE. It is subject to all state laws applicable to all other charter schools in the state of Louisiana. Belle Chasse Academy is neither a federal instrumentality nor is it operating in the fulfillment of a federal function. In implementing the charter school program in La.R.S. 3971 et.seq., the Louisiana legislature was furthering its obligation to "provide for the education of the people of the state and maintain a public educational system."[19] Belle Chasse Academy is a school subject to the regulation of state entities and state laws. The operation of Belle Chasse Academy is not related to the operation of the naval base and generally no interference with the operation of the naval base should result from the activities undertaken on the leased property.
In response to questions two and three, pursuant to La.R.S.52:1(C), all civil and criminal process issued under the authority of the state of Louisiana can be served on an individual located on the United States Naval Air Station/Joint Reserve Base New Orleans. The procedure for service of an individual located on a naval installation is governed by 32 C.F.R. § 720.20 et. seq. The service of a subpoena would be included in the state's ability to serve process. However, determining the enforceability of a subpoena and if a state court has jurisdiction over a person located on a facility within a federal enclave requires a fact specific analysis. This office is unable to provide a general response to your inquiry, because different facts may result in different findings. We believe that the cited cases and facts about Belle Chasse Academy would be essential in any jurisdictional analysis.
Your fourth question relates to the jurisdiction of the Office of Community Services on the United States Naval Air Station/Joint Reserve Base New Orleans. The field of domestic relations, including the adjudication of custody of an abused or neglected child, is within the jurisdiction of the states. As the United States Supreme Court stated in Ex Parte Burrus, "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States."[20] Applying the principles set forth inHoward, Paul and Beauregard, the state may exercise its power over federal areas within its boundaries as long as there is no interference with jurisdiction asserted by the federal government.
Congress has enacted laws addressing child abuse and neglect with respect to the development and implementation of programs by states. For example, 42 U.S.C. § 5106a, the Child Abuse Prevention and Treatment Act, authorizes grants to states that develop child abuse and neglect prevention and treatment programs. Grants awarded under this Act are for the purpose of assisting the States in improving the child protective services system of each state in a variety of areas.[21] Among the requirements to qualify, a state must set forth a plan for child welfare services that includes:
 (i) provisions or procedure for reporting of known and suspected instances of child abuse and neglect;
 (iv) procedures for the immediate screening, risk and safety assessment, and prompt investigation of such reports; [and]
 (vi) procedures for immediate steps to be taken to ensure and protect the safety of the abused on neglected child and of any other child under the same care who may also be in danger of abuse or neglect and ensuring their placement in a safe environment;[22]
The Social Security Act also provides grants to states for "establishing, extending, and strengthening child welfare services."[23] Child welfare services are defined as public social services that are directed toward the accomplishment of protecting and promoting the welfare of all children and preventing or remedying the neglect, abuse, exploitation, or delinquency of children.[24] Funds are distributed to a state under the Social Security Act after it demonstrates that it has a plan for child welfare services that has been developed jointly with the Secretary of Health and Human Services and the appropriate state agency.[25]
The Department of Defense, in Directive Number 6400.1, requires each military department to create a Family Advocacy Program. A Family Advocacy Program is defined as "[a] program designed to address prevention, identification, evaluation, treatment, rehabilitation, follow-up, and reporting of family violence. FAPs consist of coordinated efforts designed to prevent and intervene in cases of family distress, and to promote healthy family life."[26]
Directive Number 6400.1 requires "cooperation with responsible civilian authorities in efforts to address the problems to which this Directive applies."[27] Directive No. 6400.1 also requires local Family Advocacy Program offices to notify the local public child protective agency in cases of child abuse and neglect.[28]
The Department of the Navy has implemented a Family Advocacy Program.[29] The Navy Family Advocacy Program sets forth the same purpose identified in Department of Defense Directive No. 6400.1.[30] The Navy Family Advocacy Program does not have investigative or enforcement authority. If an allegation of child abuse comes to the attention of the command or the Family Advocacy Representative (FAR), the FAR is required to notify the appropriate state and civilian agency having child protective service functions and, in certain circumstances, law enforcement officials.[31] Both Department of Defense Directive 6400.1 and OPNAVINST 1752.2A state that they serve as internal guidance "to protect and assist actual or alleged victims of child and spouse abuse. It is not intended to and does not create any rights, substantive or procedural, enforceable at law by any victim, witness, suspect, accused, or other person in any matter, civil or criminal."[32]
The Louisiana Children's Code governs child abuse and neglect in Louisiana. The Office of Community Services (OCS) is created within the Louisiana Department of Social Services.[33] Its functions include providing for the public child welfare functions of the state, including but not limited to, child protective services.[34] Louisiana state courts exercising juvenile jurisdiction have exclusive jurisdiction over children in need of care.[35] Children in need of care include those subject to abuse, exploitation or neglect.[36]
The Louisiana Children's Code requires that local child protection units investigate allegations of child abuse and neglect.[37]
The purpose of the Child in Need of Care provisions of the Louisiana Children's Code is to provide for the protection of children from abuse, neglect or exploitation and the investigation of such complaints. Federal law requires states to provide basic child welfare services to qualify for funds to combat abuse and neglect. In addition, both the Navy Family Advocacy Program and the Department of Defense require the notification of local child protective services in cases of abuse and neglect. Based on the foregoing, it appears that federal law does not conflict with Louisiana law governing child abuse and neglect. Rather, "[a]ccommodation and cooperation" appear to be their aim.[38]
Louisiana law on child abuse and neglect promotes the federal policy regarding abused children, as reflected in the Child Abuse Prevention and Treatment Act, the Social Security Act and the applicable Department of Defense and Navy regulations.
The provisions of the Louisiana Children's Code governing child abuse and neglect do not conflict with federal governmental functions and have not been abrogated or preempted by conflicting federal enactments. Absent the enactment of a federal law governing the investigation and enforcement of reports of child abuse and neglect, Louisiana law applies. It is therefore the opinion of this office that the provisions of the Louisiana Children's Code governing child abuse and neglect are applicable on the United States Naval Air Station/Joint Reserve Base New Orleans. We believe that the Navy Family Advocacy Program serves as a supplement to the state's efforts to combat child abuse and neglect.
You have also asked about an OCS worker's ability to take a child into custody. La. Ch. C. Art. 612 provides that when conducting an investigation of a report of abuse or neglect, "[a]dmission of the investigator on school premises or access to the child in school shall not be denied by school personnel." In the event that an investigator is denied admission to the school, La. Ch. C. Art. 613 permits a court to grant an entry order. A child can be taken into custody by an OCS worker if an instanter order is obtained from a court.[39] In order to receive an instanter order, an OCS worker must demonstrate to the court that there are reasonable grounds to believe that the child is in need of care and that emergency removal is necessary to secure the child's protection.[40] Please note that "a peace officer or probation officer of the court may take a child into custody without a court order if he has reasonable ground to believe that the child's surroundings are such as to endanger his welfare and immediate removal appears to be necessary for his protection."[41]
Because we have reached the conclusion that the Louisiana Children's Code applies on the United States Naval Air Station/Joint Reserve Base New Orleans, it is our opinion that an OCS worker can take a child into custody if the applicable provisions of the Children's Code referenced above are complied with. Obviously, the ability to secure a child's safety is an essential provision of the Louisiana Children's Code. In order for such laws to be effective as to children located on the naval base, it must be concluded that state or local officials are authorized to act pursuant to the applicable provisions of the Louisiana Children's Code.
This office has reached its conclusion as to the applicability of the Louisiana Children's Code based on our review of state and federal law relating to child abuse. However, please note that determinations of the applicability of federal or state law on a federal enclave ultimately rest with federal authorities and federal courts. To help avoid potential questions concerning the applicability of the Louisiana Children's Code, if not already in place, we would encourage officials at the United States Naval Air Station/Joint Reserve Base New Orleans and state and local officials to enter into cooperative agreements.
Your final question is in reference to the applicability of the Louisiana Public Works Act, La.R.S. 38:2241 et seq., to school construction projects. You indicate that all immovable property is located on the military base and that all property is owned by the federal government and leased via Belle Chasse Education Foundation to Belle Chasse Academy, Inc. Generally, if school construction projects involve property owned by the federal government or result in federal government ownership of the property, federal law will apply. The federal law governing bonding of public works is the Miller Act, 40 U.S.C. § 3131, §3133. The Miller Act and its predecessor, the Heard Act, were enacted by Congress primarily to provide a remedy for subcontractors and material suppliers that would traditionally rely upon a materialman's lien, but for the fact that a lien cannot attach to government property.[42] 40 U.S.C. § 3131(b) provides:
 (b) Type of Bonds required. Before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government the following bonds, which become binding when the contract is awarded:
 Performance bond. A performance bond with a surety satisfactory to the officer awarding the contract, and in an amount the officer considers adequate, for the protection of the Government.
 Payment bond. A payment bond with a surety satisfactory to the officer for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person. The amount of the payment bond shall equal the total amount payable by the terms of the contract unless the officer awarding the contract determines, in a writing supported by specific findings, that a payment bond in that amount is impractical, in which case the contracting officer shall set the amount of the payment bond. The amount of the payment bond shall not be less than the amount of the performance bond.
It is the opinion of this office that if the United States owns the property in question and the United States or its agent is the contractor for the public work, the Miller Act applies.
If Belle Chasse Academy, Inc. initiates a public works contract involving federal property, a fact specific analysis must be performed to determine if state or federal public works law applies. Federal courts have extended the Miller Act to situations where federal government land ownership and contracting are not both present, but federal case law varies as to Miller Act applicability depending upon the facts presented.[43] In addition, federal case law is split on whether the Miller Act preempts a subcontractor or supplier from bringing suit under state law against a surety or other party involved in a governmental construction project. In sum, there is no general rule as to the applicability of the Miller Act when parties other than the federal government are involved in construction on federal property. This type of determination must be made by federal officials and federal courts interpreting the applicability of the Miller Act when confronted with specific facts regarding any construction project undertaken by Belle Chasse Academy, Inc.
I hope this opinion sufficiently addresses your concerns. If I can be of further assistance, please let me know.
Very truly yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 By:__________________________________ Katherine M. Whitney Assistant Attorney General
CCF, Jr.:KMW:lrs
[1] La.R.S. 17:3973(2).
[2] La.R.S. 12:207(B)(3).
[3] Fort Leavenworth R.R. Co. v. Lowe, 114 U.S. 525
(1885).
[4] Newcomb v. Rockport, 66 N.E. 587 (Mass. 1903).
[5] Sinks v. Reese, 19 Ohio St. 306 (1869).
[6] Lowe v. Lowe, 133 A. 729 (Md. 1926); Chaney v.Chaney, 201 P.2d 782 (N.M. 1949); Dicks v. Dicks,170 S.E. 245 (Ga. 1993); Pendleton v. Pendleton, 201 P.62 62 (Kan. 1921)
[7] 344 U.S. 624 (1953).
[8] Id. at 627.
[9] 371 U.S. 245 (1963).
[10] Id.
[11] Id. at 269.
[12] 398 U.S. 419 (1970).
[13] Adams v. Londeree, 139 W.Va. 748 (1954).
[14] Board of Comm'rs of County of Arapahoe v. Donoho,144 Colo. 321 (1960); Board of ChosenFreeholders of County of Burlington v. McCorkle,98 N.J. Super. 451 (1968).
[15] In re Terry Y., 101 Cal.App.3d 178 (1980).
[16] Cobb v. Cobb, 406 Mass.21 (1989).
[17] 378 So.2d 404 (1979).
[18] Beauregard, 378 So.2d at 408, citing Penn Dairies,Inc. v. Milk Control Commission ofPennsylvania, 318 U.S. 261, 269 (1943).
[19] La. Const. Art. VIII § 1.
[20] 136 U.S. 508 (1890). See also, Ankenbrandt v.Richards, 504 U.S. 689 (1992).
[21] 42 U.S.C. § 5106.
[22] 42 U.S.C. § 5106a(b)(2)(A).
[23] 42 U.S.C. § 620.
[24] 42 U.S.C. § 625(a)(1)(A) and (B).
[25] 42 U.S.C. § 622.
[26] Department of Defense Directive No. 6400.1, at page 8, Enclosure 1, E1.1.4 (August 23, 2004) at http://www.dtic.mil/whs/directives/corres/pdf/d64001_ 082304/d64001p.pdf.
[27] Id. at page 3, Number 4.6.
[28] Id. at page 9, Enclosure 2, E2.1.1.
[29] Department of the Navy, Office of the Chief of Naval Operations, OPNAVINST 1752.2A (July 17, 1996) at http://neds.nebt.daps.mil/directives/1752a2.pdf.
[30] OPNAVINST 1752.2A, at Enclosure (1), Page 4, Number 13.
[31] OPNAVINST 1752.2A, at Enclosure (4), Page 2, Number 2.
[32] DOD Directive No. 6400.1 at page 2, Number 1.4; OPPNAVINST 1752.2A at page 1 and 2.
[33] La.R.S. 36:471(C)(1).
[34] La.R.S. 36:477(C)(1).
[35] La. Ch. C. Art. 303(A)(2); La. Ch. C. Art. 604
[36] La. Ch. C. Art. 601; La. Ch. C. Art. 606.
[37] La. Ch. C. Art. 612.
[38] Howard v. Commissioners of Sinking Fund ofLouisville, 344 U.S. 624 (1953).
[39] La. Ch. C. Art. 621(B).
[40] La. Ch. C. Art. 619
[41] La. Ch. C. Art. 621(A).
[42] See Illinois Sur. Co. v. John Davis Co.,244 U.S. 376 (1917).
[43] See United States ex rel. Mississippi Road SupplyCo. v. H.R. Morgan, Inc. wherein the Fifth Circuit established the following test in as to the applicability of the Miller Act: "[i]t must be true that either (1) the subcontractors and suppliers of material could assert an action for equitable recovery against the United States or one of its agencies, or (2) normal state labor and material lien remedies are unavailable because of federal ownership of the lands." The Court noted that the source of funding should not be the whole test. 542 F.2d 262, 266 (5th Cir. 1976), citing United States ex rel. Miller v. Mattingly BridgeCo., 344 F.Supp. 459, 462 (W.D.Ky. 1972), overruled on other grounds, 554 F.2d 164 (5th Cir. 1977)