The PEOPLE of the State of
Colorado, Complainant,

v.

Richard D. TORPY, Attorney–
Respondent.

No. 97SA302.

Supreme Court of Colorado,
En Banc.

Sept. 14, 1998.

Linda Donnelly, Disciplinary Counsel,
James S. Sudler, Assistant Disciplinary
Counsel, Denver, Colorado, for complainant.

Michael Makaroff, Denver, Colorado, for
attorney-respondent.

PER CURIAM.

In this lawyer discipline case, a hearing panel of the grievance committee approved the findings of a hearing board that the respondent, Richard D. Torpy, had knowingly misappropriated $9,000 belonging to his clients. The panel generally approved the board's recommendation that Torpy be suspended for three years, but rejected the board's recommendation to give him ten months credit for the time he was on disability inactive status. The complainant has excepted to the panel's action on the ground that Torpy should be disbarred for his knowing misappropriation. Torpy claims that the panel should have accepted the board's recommendation of a ten-month credit on the three-year suspension. We reject the hearing panel's recommendation and order that Torpy be disbarred, effective thirty days after the release of this opinion.

## I.

The respondent was licensed to practice law in Colorado in 1972. Two formal complaints were filed against him: GC 96B–3 and GC 96A–129. They were consolidated for one hearing, at the conclusion of which the hearing board made the following findings by clear and convincing evidence.

## A. GC 96A–129

Henry and Alvis Bullock purchased the Corydon, Vanderbilt, and Adaline mining claims in Central City, Colorado, in 1991, before the development of gambling. They intended to build a cabin on the land. The Corydon and Vanderbilt claims were purchased for a total of $9,000; the Bullocks paid $10,000 for the Adaline claim. Stewart Title Company issued title insurance on the claims in the amounts of $9,000 and $10,000, respectively.

In 1973, Vernon L. Dunn was issued a tax deed by the Gilpin County Tax Assessor on a mining claim known as the Cork claim, for which he paid less than $100.

In 1992, however, Scott Bradley purchased several Central City lots, some of which overlapped the Bullock and Dunn mining claims. Stewart Title issued Bradley a title insurance policy in the amount of $500,000. Bradley intended to build a parking lot on the land and obtained the necessary permits. When he commenced excavation, the Bullocks arrived and saw the parking lot under construction on the land they believed they owned. Bradley declined to comply with the Bullocks' and Dunn's request they stop construction. Subsequently, Bradley filed an action to quiet title in August 1993. The action related only to the Corydon, Vanderbilt, and Cork mining claims. The Adaline claim was not referenced. Dunn and the Bullocks hired the respondent to defend their claims to the property. Torpy filed a counterclaim to quiet title against Bradley, and requested damages arising from Bradley's use of the property.

Stewart Title decided to defend Bradley under the terms of the $500,000 policy they had issued him. Stewart Title elected to pay the Bullocks the $9,000 face value of the title policy it had issued on the Corydon and Vanderbilt mining claims as full and complete satisfaction of its obligation to the Bullocks for those two claims. On September 14, 1993, Stewart Title sent a check to Torpy made out to the Bullocks in the amount of $9,000. On that same date, Torpy wrote to Stewart Title's counsel indicating that the check would be accepted. On October 8, 1993, however, Torpy advised the Bullocks not to accept the check because they might forfeit any right to take action against the title company if they accepted it. The Bullocks declined to accept the check, but Torpy did not notify Stewart Title of his client's rejection. Instead, on December 31, 1993, he sent a note to Stewart Title's counsel requesting the check to be reissued to his own trust account. He deposited the new check in the trust account, all without the Bullocks' knowledge or permission. When the respondent did file a third-party complaint against Stewart Title, the court held that his acceptance of the $9,000 check constituted an accord and satisfaction barring the Bullocks from any further claim against the title company. Torpy did not tell the Bullocks the real reason the complaint was dismissed, but advised them not to appeal the dismissal.

The main issue in the underlying case was the priority of title, with one title originating from a federal mining patent and another from a town-site grant. Another issue involved whether Bradley had met the requirements for adverse possession. The board found that the case grew unusually complicated, and involved the examination of hundreds of documents tracing title in Central City from 1870 to the present. It is not necessary to set forth the history of the case in any further detail.

The complaint charged, and the hearing board found, that the respondent violated Colo. RPC 1.4(a) by failing to advise the Bullocks of his receipt of the $9,000 check. The complaint also charged the respondent with violating Colo. RPC 1.1 (failing to provide competent representation); Colo. RPC 1.3 (neglecting a legal matter); Colo. RPC 3.2 (failing to make reasonable efforts to expedite litigation); and Colo. RPC 3.4(d) (failing to make diligent efforts to comply with discovery). However, the hearing board concluded that he did not violate any of those provisions:

> [T]he respondent did not incompetently represent the Bullocks and Mr. Dunn as charged in the complaint. To the contrary, the respondent exhibited diligence and competence throughout the litigation of this matter. The Bullock and Dunn matter quickly grew into an exceptionally complex real estate case which ended in a ruling that benefited none of the parties.

The complainant has not excepted to the board's findings. We discuss the appropriate discipline for this violation in Part II, below.

## B. GC 96B–3

### Count I

■ Between January 1994 and January 1995, 83 checks written on Torpy's operating account were returned for non-sufficient funds. Eight of the returned checks were related to his law practice, and the rest were for personal matters. Eighteen of the checks were returned after a second presentation. Many of the checks were covered by the bank and all of the remaining returned checks were made good within thirty days. The bank closed Torpy's operating account in 1995 because of the number of non-sufficient checks.

The foregoing conduct violated Colo. RPC 8.4(h) (engaging on conduct adversely reflecting on a lawyer's fitness to practice); Colo. RPC 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and C.R.C.P. 241.6(4) (any act or omission constituting gross negligence).

### Count II

The respondent deposited the $9,000 check from Stewart Title into his trust account in February 1994 without advising the Bullocks of what he had done. By April 1994 he had used all of the $9,000 for his own purposes.

Alvis Bullock had been billed by Torpy on numerous occasions and all of the bills had been paid promptly. At no time during 1994 did he tell her that he had received the $9,000 despite her inquiries about the money, nor did he tell her he intended to apply the $9,000 toward attorney fees. On January 31, 1995, however, the respondent sent the Bullocks a bill which included a note which said, "I sincerely appreciate the way you have paid this. I have asked the insurance company for the $9,000. If you wish I will apply it against your balance." On February 15, 1995, he credited the Bullocks in the amount of $9,000.

The hearing board concluded that the respondent's misappropriation of the $9,000 violated Colo. RPC 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; and engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

## II.

The hearing panel approved the board's recommendation that the respondent be suspended for three years, but without the ten-month credit for the time he was on disability inactive status. The complainant has excepted to the recommendation and claims disbarment is appropriate.

■ Recognizing the significance of Torpy's mental state, the board entertained testimony from mental health professionals.

Dr. David Muller, a psychiatrist, first treated Torpy in 1986 with respect to his marital problems. Then in May 1994, Dr. Muller met with Torpy and decided that he exhibited depression and decreasing function. Dr. Muller also indicated that the respondent was "diminished in his ability to perform."

Kevin O'Brien, a social worker and therapist with Kaiser Permanente's chemical treatment services confirmed that when Torpy began treatment there in March 1996, his thinking was impaired, as shown by his intermittent use of alcohol while in treatment and his rationalizations of this behavior. By his last treatment session, however, the respondent had a clear awareness of his need to remain abstinent from alcohol.

In connection with these disciplinary proceedings, Torpy was evaluated by two other mental health professionals. Frederick M. Miller, M.D., evaluated the respondent when he sought reinstatement to active status from disability inactive status. He also evaluated Torpy a year later. Dr. Miller thought that Torpy suffered from depression, abused alcohol, and acted with a diminished capacity which Dr. Miller defined as an inability to use critical judgment. Dr. Miller indicated, however, that the respondent's behavior was "at all times, knowing behavior and it was deliberate although not behavior that was likely rationally decided upon."

Finally, beginning in February 1996, Torpy was interviewed by Todd Poch, Ph.D., over several months to assess his psychological state. Dr. Poch found that the respondent suffered from depression and anxiety, that his cognitive ability to process information was impaired, and that he had difficulty in converting information into logical conclusions. Dr. Poch initially concluded that the respondent was not competent to practice law. According to Dr. Poch, if the term "knowing" is defined as an "ability to assess behavior in terms of probable outcome," then Torpy did not act knowingly.

■ The testimony from these mental health professionals was to some extent conflicting, specifically in whether the respondent acted knowingly when he misused the $9,000. Resolving these conflicts, the board found that

despite testimony from several mental health professionals about the respondent's diminished capacity, we cannot conclude that the respondent did not act knowingly when he accepted the check from Stewart Title and used the funds for his own purposes. According to the respondent, at the time that he used the Bullocks' funds, he had inadequately billed the Bullocks and he rationalized that the money was, in essence, a payment for work that he had done. While the respondent may have been unable to adequately process the consequences of his actions, there is no question that he knew that he was taking funds that did not belong to him, and that he recognized the impropriety of his acts.

The board conceded that our cases have consistently held that disbarment is appropriate when a lawyer knowingly misappropriates client funds, at least in the absence of extraordinary mitigating factors:

> We have repeatedly held that a lawyer's knowing misappropriation of funds, whether belonging to a client or third party, warrants disbarment except in the presence of extraordinary factors of mitigation. *See, e.g., People v. Mundis,* 929 P.2d 1327, 1331 (Colo.1996) (lawyer disbarred for knowing misappropriation of client funds, neglect of client matters, and practicing law under suspension); *People v. Motsenbocker,* 926 P.2d 576, 577 (Colo.1996) (lawyer disbarred for knowingly misappropriating bar association funds); *see also* ABA *Standards [for Imposing Lawyer Sanctions]* 4.11 [1991 & Supp.1992] (in the absence of mitigating factors, "[d]isbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.").

*People v. Lavenhar,* 934 P.2d 1355, 1359 (Colo.1997). In aggravation, Torpy received a letter of admonition in 1995 for failing to make stipulated payments on a debt. Since that misconduct occurred at about the same time as the misconduct in this case, it is evidence of a pattern of misconduct, *see* ABA *Standards for Imposing Lawyer Sanctions* 9.22(c) (1991 & Supp.1992) (ABA *Stan-*

*dards*), rather than prior discipline. There are multiple offenses in this case, *see id.* at 9.22(d), and Torpy has substantial experience in the practice of law, *see id.* at 9.22(*l*). The hearing board nevertheless concluded that disbarment would be an injustice in this case because of the presence of significant mitigating factors.

First, according to the board, and contrary to the charges in the complaint, Torpy represented his clients with competence and diligence throughout the complex real estate case. Second, Torpy has practiced for twenty-five years with no other discipline until certain stressful events in his life began to manifest themselves. *See id.* at 9.32(a). Most significant,

> [a] deciding factor for the board is that the respondent's use of client funds was limited to one instance.... The respondent's acts were limited to this one event, and they occurred during a period when he was undergoing extraordinary stress. There is no evidence that, with continued rehabilitation, these acts are likely to occur again. In fact, the respondent's expression of embarrassment and contrition regarding his past actions, combined with his efforts to have more control over the problems in his life, lead us to the conclusion that the respondent is not likely to be a danger to the public.

The extraordinary stress during the relevant period in this case arose from an exceptionally hostile and prolonged dissolution of marriage, personal financial losses, a serious motor vehicle accident in 1990 resulting in hospitalization for a month and confinement to a wheelchair, his filing for bankruptcy and the deterioration of his law practice, and alcohol abuse. In March 1994, Torpy suffered a severe heart attack, apparently stress-related. Torpy voluntarily asked to be placed on disability inactive status on May 9, 1996. Eventually acknowledging the seriousness of his problems, he has abstained from the use of alcohol since June 1996. He was reinstated from disability inactive status in March 1997. These personal and emotional problems are a mitigating factor. *See id.* at 9.32(c). The board was impressed with the quality and sincerity of the testimony and

letters written in Torpy's support attesting to his good character, another factor in mitigation. *See id.* at 9.32(g). He has also cooperated in these proceedings, *see id.* at 9.32(e), and has expressed remorse, *see id.* at 9.32(*l*).

We do not consider the fact that Torpy's "use of client funds was limited to one instance" a deciding factor in favor of a sanction less than disbarment, as did the board. In *People v. Motsenbocker,* 926 P.2d 576, 577 (Colo.1996), we accepted a conditional admission and disbarred Motsenbocker for misappropriating $2,350 in bar association funds over a four-month period by writing six checks on the bar association checking account to himself. The record that we have in this case is silent on the precise way in which Torpy misappropriated his clients' $9,000, but whether he did it by way of six checks as in *Motsenbocker,* or by a single withdrawal, is not important for disciplinary purposes.

Further, in *People v. Guyerson,* 898 P.2d 1062, 1063–64 (Colo.1995), we disbarred the lawyer for knowingly misappropriating law firm funds. We found that the presence of the same mitigating factors as in this case— the absence of a prior disciplinary history in fourteen years of practice, *see* ABA *Standards* 9.32(a); the presence of substantial personal and emotional problems, *see id.* at 9.32(c); cooperation with the hearing board, *see id.* at 9.32(e); the presence of remorse, *id.* at 9.32(*l*); and evidence of the respondent's good character and reputation, *see id* . at 9.32(g)—insufficient to call for a sanction less than disbarment. *See Guyerson,* 898 P.2d at 1064. We see no reason to deviate from that result in this case.

The cases cited by Torpy in support of his claim that we have found suspension appropriate under analogous facts are distinguishable. Neither involved a finding of knowing misappropriation. In *People v. Rudman,* 948 P.2d 1022, 1027–28 (Colo.1997), we suspended Rudman for three years rather than disbarring him. Rudman was the personal representative of an estate and in that capacity he engaged in a pattern of lies calculated to mislead the sole beneficiary of the estate as to the whereabouts of certain assets of the estate. *See id.* at 1023–24. We noted that in the absence of mitigating factors, specifically

the fact that Rudman had not been disciplined before in nineteen years of practice, we would have disbarred Rudman. *See id.* at 1026. Two members of the court would nevertheless have disbarred him. *See id .* at 1027. But, unlike this case, Rudman's conduct did not involve a knowing misappropriation of client funds.

We suspended the lawyer in *People v. Hanks,* No. 97SA215, slip op. at 9–10, 966 P.2d 1043, 1044 (Colo. Jan. 20, 1998), for two years for making misrepresentations to investors in his investment company concerning his past performance in options trading, his compensation, the value of the investors' interests, and the earnings made from the investments. *See id.* at 6, 966 P.2d at 1042. Hanks also served as an investment advisor without being registered, served as a broker from April 1990 to September 1991 without proper registration, and his company sold securities without being properly registered as an investment company, all in violation of federal securities law. *See id.* In accepting a conditional admission in the case, we noted that, in addition to other factors in mitigation, Hanks had not been previously disciplined in sixteen years of practice. *See id.* at 7, 966 P.2d at 1042. Hanks was not charged with knowing misappropriation of the investors' money, however.

Three cases involving misappropriation in which we did not disbar the lawyer further illustrate the principle involved. In *People v. Price,* 929 P.2d 1316 (Colo.1996), we accepted a conditional admission in which the parties had stipulated that Price's misappropriation of client funds "was due to inattention and neglect rather than to a knowing conversion." *Id.* at 1317. Moreover, the complainant stipulated to the absence of a dishonest or selfish motive on Price's part, a mitigating factor not present in this case. *See id.* at 1320. Price was suspended for a year and a day. *See id.* at 1320–21.

*People v. Galindo,* 884 P.2d 1109 (Colo. 1994), was a contested case tried before a hearing board. The hearing board specifically "rejected the assistant disciplinary counsel's most serious charge, that the respondent knowingly and intentionally converted [client trust] funds." *See id.* at 1111. The board found that Galindo's "account of his handling of the [client] trust funds was credible and persuasive, and the board concluded that the respondent's mishandling of the funds was the result of neglect rather than dishonesty." *Id.* at 1112. We determined that the board's finding was supported by substantial evidence in the record. *See id.; see also People v. Wechsler,* 854 P.2d 217, 220–21 (Colo.1993) (refusing to overturn hearing board's conclusion that intentional conversion was not established by clear and convincing evidence where there was substantial evidence in the record to support it). The hearing board dismissed the charge that Galindo had violated DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation; now at Colo. RPC 8.4(c), which *was* violated in this case). *See Galindo,* 884 P.2d at 1110. The board also found that the absence of a dishonest or selfish motive was a mitigating factor in the *Galindo* case, *see id.* at 1112, a factor not present in this case.

Finally, in *People v. Lujan,* 890 P.2d 109 (Colo.1995), the lawyer stole funds from her law firm, which would ordinarily call for disbarment. *See id.* at 112. Lujan was not disbarred, however, because the sudden emergence of a mental disorder following a tragic accident occurring in Egypt was what caused her to engage in the misappropriation. *See id.:*

> The hearing board found that [Lujan's] mental disability was the primary consideration in their analysis of discipline. A mental disability is a mitigating factor under the circumstances contained in ABA *Standards* 9.32(i), which provides:
>
> > (i) mental disability ... [may be considered as a mitigating factor] when:
> >
> > (1) there is medical evidence that the respondent is affected by a ... mental disability;
> >
> > (2) the ... mental disability caused the misconduct;
> >
> > (3) the respondent's recovery from the ... mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

ABA *Standards* 9.32(i) (Supp.1992). The board concluded that the expert evidence, both from the respondent's treating psychiatrist and from the psychologist selected by this court to examine her, was clear that the respondent's mental disability was a mitigating factor under standard 9.32(i). The board found that the respondent's obsessive compulsive disorder caused the misconduct by manifesting itself as an overwhelming compulsion to shop following her experiences in Egypt. The board thought it significant that the type of disorder that the respondent suffers from "is a lifetime affliction of biological origin which cannot be controlled without medication." The misconduct was arrested once the respondent's disorder was properly diagnosed and treated with the correct medication.

*Id.* The mental disability mitigating factor was not found to exist in this case, nor did the respondent's personal and emotional problems cause his misconduct. *Lujan* is therefore distinguishable.

The mitigating factors present in this case are significant. Two members of the court would accept the recommendations of the panel, and of the board, and would suspend the respondent for three years. Nevertheless, we conclude that disbarment is the only appropriate outcome where it has been shown, by clear and convincing evidence, that the lawyer has knowingly misappropriated client funds.

In a recent case involving similar mitigating factors, the New Jersey Supreme Court was asked to abandon its strict conformity to the same rule we uphold today. *See In re Greenberg,* 155 N.J. 138, 714 A.2d 243, 250 (1998). That court declined to do so:

> Today we reaffirm the rule announced in [*Matter of*] *Wilson* [81 N.J. 451, 409 A.2d 1153 (1979)] and hold that disbarment is the appropriate sanction in cases where it has been shown, by clear and convincing evidence, that an attorney has knowingly misappropriated client funds. We accept as an inevitable consequence of

the application of this rule that rarely will an attorney evade disbarment in such cases. Public confidence in the "integrity and trustworthiness of lawyers" requires no less.

*See id.* We also believe that this rule remains sound, and that to allow deviation without an extraordinary reason to do so would create uncertainty and inevitably lead to even less equitable results than adherence to the rule would.

### III.

Accordingly, Richard Donald Torpy is hereby disbarred, effective thirty days from the issuance of this opinion. He is ordered to pay the costs of this proceeding in the amount of $5,379.15 within ninety days to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202.