The **PEOPLE** of the State Of Colorado, Complainant.

v.

Steven Jay **ROZAN**, Respondent.

No. 10PDJ064.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Aug. 26, 2011.

---

## OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)

### I. *SUMMARY*

Respondent accepted a $30,000.00 retainer to file a post-conviction petition on behalf of his client, who was serving a sentence in federal prison. He then used the funds for his own purposes without obtaining his client's approval or earning those fees. The PDJ previously granted two motions for partial judgment on the pleadings, determining as a matter of law that Respondent violated Colo. RPC 1.15(b), 1.16(d), and 8.4(c). In light of the serious nature of Respondent's misconduct and the extensive aggravating factors present here, including a lengthy record of discipline for similar infractions, the Hearing Board determines that the appropriate sanction is disbarment.

### II. *PROCEDURAL HISTORY*

On June 8, 2010, the People filed a complaint in this matter, alleging that Respondent violated Colo. RPC 1.3, 1.4(a), 1.5(a), 1.15(b), 1.16(d), and 8.4(c). Respondent filed an answer on July 12, 2010, and filed a supplemental answer on August 6, 2010.

The People filed a motion seeking partial judgment on the pleadings on December 10, 2010, to which Respondent responded on February 3, 2011. The PDJ granted the People's motion on March 9, 2011, determining that Respondent violated Colo. RPC 8.4(c) (Claim VI).

The People then filed a second motion requesting partial judgment on the pleadings on March 23, 2011, to which Respondent did not respond. On May 18, 2011, the PDJ granted the People's motion and concluded

that the conduct underlying Respondent's violation of Colo. RPC 8.4(c) also contravened Colo. RPC 1.15(b) and 1.16(d) (Claims IV and V).

Respondent filed a motion to resign his law license in lieu of prosecution on May 13, 2011, to which the People objected on May 16, 2011.[1] Shortly thereafter, Mr. Gross entered his appearance on behalf of Respondent, who previously had been acting pro se. On May 20, 2011, the People filed a motion seeking to dismiss Claims I, II, and III of the complaint (Colo. RPC 1.3, 1.4(a), and 1.5(a)) and to convert the trial scheduled in this matter to a sanctions hearing. The PDJ granted that motion on May 28, 2011.

During the sanctions hearing on June 14, 2011, the Hearing Board heard testimony and considered the People's exhibits 1–3, 5–6, and 9–10.

### III. *ESTABLISHED FACTS AND RULE VIOLATIONS*

#### Representation of Mark Allen

The established rule violations in this matter concern Respondent's representation of Mark Allen ("Allen"), an inmate at the United States Penitentiary Administrative Maximum Facility ("ADMAX") in Florence, Colorado.[2] In the summer of 2008, Allen hired Respondent to file a habeas corpus petition under 28 U.S.C. § 2241 or a motion challenging Allen's conviction or sentence under 28 U.S.C. § 2255. He had been convicted over ten years earlier of assault of a postal employee, possession of a firearm by a convicted felon, and related charges.

On August 27, 2008, Allen's mother, Joan Allen, wired a $30,000.00 retainer to Respondent's bank account. Respondent then hired a forensic psychiatrist to perform an evaluation of Allen, which was conducted on October 5, 2008. Having sent Respondent numerous letters inquiring about the status of

---

1. The PDJ is issuing a separate order denying that motion concurrent with the issuance of this decision.

2. The recitation of established facts and rule violations in this section of the decision is primarily

drawn from the PDJ's orders granting partial judgment on the pleadings, which contain citations to applicable averments in the People's complaint and Respondent's answers.

his matter, Allen terminated Respondent's services and demanded the return of his retainer and client file on March 30, 2009. Respondent then spoke with Allen, stating that he was awaiting several pending judicial decisions that might bear on the proper procedural route for Allen's matter.

On June 16, 2009, Allen again sent Respondent a letter demanding the refund of his retainer and the return of his client file. In response, Respondent promised to visit Allen within two to three weeks. On July 8, 2009, Allen filed a request for investigation with the People. Allen reiterated his desire to terminate Respondent in late 2009 after Respondent cancelled his scheduled visits with Allen, requesting that Respondent return his retainer and client file. Allen agreed to allow Respondent to continue working on his matter when Respondent pledged in December 2009 that he would soon file a motion on his behalf. But in January and February 2010, Allen once more demanded the return of his retainer and client file. Respondent's license to practice in Texas was suspended for two years for misconduct in unrelated client matters, effective January 1, 2010, and his license to practice in Colorado was suspended in reciprocal discipline on April 22, 2010.

Respondent admits he never filed a pleading on Allen's behalf under 28 U.S.C. § 2241 or 28 U.S.C. § 2255. Respondent indicates he delayed in doing so because he was awaiting relevant case law and having difficulties in obtaining a new medical expert witness report. Respondent has not returned any portion of Allen's retainer and has spent that sum of money. An accounting Respondent provided to the People on October 21, 2009, stated that Respondent had earned $15,750.00 of the $30,000.00 retainer.

Respondent admits, for the "purposes of accounting," that as of the date of an accounting he provided to the People,[3] he "owed" Allen and Allen's mother at least $9,687.00.[4] He also concedes that he "exercised dominion or ownership over such funds held for Allen's benefit."[5] However, Respondent denies knowing "that he was keeping at least $9,6870.00 [sic] of funds he had not earned, knowing that such funds should be returned to his client because he had not earned them and knowing that keeping such funds was not authorized."[6] Instead, Respondent claims he "believed that the fee arrangement with Allen was a flat-fee and as a Texas attorney, he did not need to deposit same into a trust account."[7] In addition, he denies the People's allegation that he "did not have permission from the client to use the funds for his personal purposes," arguing instead that he "did not believe that he needed such permission from Allen inasmuch as he was acting in the capacity as a Texas attorney and that the fee was a flat fee deemed earned upon receipt and that he need not deposit same into a trust account."[8]

## Jurisdiction and Choice of Law

■ Respondent has taken and subscribed to the oath of admission, was admitted to the Colorado bar on September 16, 1980, and is registered upon the official records under attorney registration number 10381. Although Respondent was licensed to practice law in Texas, where he maintained his office, he is currently suspended from the practice of law in both states.

Respondent contends that the PDJ and the Hearing Board lack jurisdiction in this matter and that his conduct should be judged under Texas disciplinary rules, rather than Colorado disciplinary rules.[9] The basis for both arguments is that (1) he practiced from an office in Texas and (2) his client was housed at ADMAX, which he claims is a

3. The date of this accounting is not specified, but given the amount Respondent indicates he owed, it presumably occurred after the accounting filed on October 21, 2009.

4. Complaint ¶ 99; Answer ¶ 99.

5. Complaint ¶ 100; Answer ¶ 100.

6. Complaint ¶ 101; Answer ¶ 101.

7. Answer ¶ 101.

8. Complaint ¶ 102; Answer ¶ 102.

9. As Respondent correctly observes, an argument that a court lacks jurisdiction over the subject matter of a case may be raised at any time. *See* C.R.C.P. 12(h)(3).

federal enclave that is not part of the State of Colorado. The PDJ first considers the jurisdictional and choice of law issues in light of Respondent's argument regarding his Texas-based practice; the PDJ then examines whether the federal nature of ADMAX alters his conclusions.[10]

C.R.C.P. 251.1(b) provides that "[e]very attorney licensed to practice law in the State of Colorado is subject to the disciplinary and disability jurisdiction of the Supreme Court in all matters relating to the practice of law." In addition, Colo. RPC 8.5(a) states that "[a] lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where the lawyer's conduct occurs." Here, Respondent is licensed to practice law in Colorado and this proceeding concerns his practice of law. As such, the fact that Respondent practiced from an office in Texas does not divest the Colorado Supreme Court, the PDJ, or the Hearing Board of jurisdiction over this matter.

■ The choice of law in Colorado disciplinary proceedings is governed by Colo. RPC 8.5. Where the conduct of a lawyer licensed in Colorado is not connected with a matter pending before a tribunal, as here, Colo. RPC 8.5(b) requires the PDJ to apply

> the rules of the jurisdiction in which the lawyer's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct. A lawyer shall not be subject to discipline if the lawyer's conduct conforms to the rules of a jurisdiction in which the lawyer reasonably believes the predominant effect of the lawyer's conduct will occur.

Here, Respondent practiced from an office in Texas and was considering filing a motion on Allen's behalf in the Fourth Circuit Court of Appeals. But in other respects, Respondent's representation of Allen involved substantial connections to the State of Colorado: Allen is housed in a correctional facility in Colorado, Respondent traveled to Colorado to meet with Allen, Respondent arranged for a psychiatrist to meet with Allen in Colorado, and Respondent communicated with Allen through telephone calls and letters to Colorado.

The PDJ determined in his first motion granting partial judgment on the pleadings that, although it was debatable whether Respondent's conduct "occurred" in Colorado or in Texas, the "predominant effect" of Respondent's representation of Allen was in Colorado.[11] Given that Allen was incarcerated in Colorado and had hired Respondent to obtain his release from prison, Respondent's conduct in this matter primarily affected Allen, who is located in Colorado. Under these facts, there is no basis for Respondent to have "reasonably believe[d] the predominant effect of [his] conduct" would occur elsewhere. Accordingly, the PDJ applied Colorado law in considering both of the People's motions for partial judgment on the pleadings.

At the disciplinary hearing, the People introduced additional evidence of the relationship between Respondent's conduct and the State of Colorado, in the form of an August 8, 2008, letter from Respondent soliciting Allen's business. In the letter, Respondent recommends filing a petition under 28 U.S.C. § 2241 in federal court in Denver and claims: "I am also a full member of the Colorado Bar, the U.S. District Court in Denver, the U.S. Court of Appeals for the Tenth Circuit and know most of the Denver AUSAs [Assistant United States Attorneys] and District Court judges in whose courts I have regularly practiced since becoming a licensed mem-

---

10. The PDJ, rather than the Hearing Board, addresses Respondent's jurisdictional and choice of law arguments pursuant to C.R.C.P. 251.18(b)(2), which provides that the PDJ "shall rule on all motions, objections, and other matters presented after a complaint is filed and in the course of a hearing."

11. See In re Tonwe, 929 A.2d 774, 776–78 (Del. Supr.2007) (holding that Del. RPC 8.5 governed the conduct of an attorney licensed solely in Pennsylvania who represented Delaware residents in personal injury cases from a Pennsylvania office, because she had been physically present in Delaware to represent clients on three occasions, physical presence is not required to establish that a person is providing legal services in a state, and she did "everything short of appearing in Delaware courts").

ber of that Bar since [sic] 1980." Yet at the disciplinary hearing, Respondent testified that his legal experience in this state is limited to one sentencing matter in U.S. District Court in Denver and one argument before the Colorado Supreme Court. Respondent offered the untenable argument that his letter referred to his appearance in a Tenth Circuit case in Wyoming, during the course of which he gained some familiarity with Tenth Circuit judicial opinions and spoke by telephone with an AUSA about extensions for filing legal briefs. The PDJ finds that Respondent's reference to purportedly significant legal connections and practice in Colorado in the course of soliciting Allen's business provides further support for applying Colorado disciplinary rules in this matter.

■ Respondent argued at the sanctions hearing for the first time that the PDJ and the Hearing Board lack jurisdiction and the Colorado Rules of Professional Conduct do not apply here because Allen resides in a federal enclave, which is not part of the State of Colorado. The PDJ is reluctant to address this argument for several reasons: Respondent did not raise it earlier, he cited no supporting legal authority, and the PDJ already determined that Colorado law applies in this matter. However, the PDJ briefly analyzes this argument for purposes of judicial economy.

■ A federal enclave is defined as ■a portion of land over which the United States government exercises exclusive federal juris-

diction." [12] Although the PDJ is unaware of any case law explicitly addressing whether state disciplinary rules govern the provision of legal services in federal enclaves, Colorado case law suggests that the Colorado Rules of Professional Conduct apply to legal services provided to ADMAX inmates.

■ In a 1960 decision, the Colorado Supreme Court determined that the federal government's " 'exclusive legislative' jurisdiction" over the Fort Logan military reservation "does not operate as an absolute prohibition against state laws but has for its purpose protection of federal sovereignty...." [13] As such, the court rejected the argument that Arapahoe County, which encircles Fort Logan, could avoid making public assistance payments to an otherwise qualifying individual who lived on the reservation.[14] In that decision, the court found that federal purchase or a state's cession of territory under Article I, Section 8, Clause 17 of the United States Constitution does not establish "a unique and unreservedly exclusive sovereignty within the federal enclave." [15] As noted in decisions from other jurisdictions, federal jurisdiction over federal enclaves is intended to "protect the federal government against conflicting regulations." [16] As a result, states generally may enforce on federal enclaves state laws concerning topics over which the federal government has failed to exercise jurisdiction, such as certain voting, public education, and welfare matters, because such laws do not infringe upon federal sovereignty.[17]

12. *Benjamin v. Brookhaven Science Assocs., LLC,* 387 F.Supp.2d 146, 157 (E.D.N.Y.2005) (internal quotation omitted). The federal enclave concept derives from U.S. Const. Art. I, § 8, cl. 17, which empowers Congress to exercise "exclusive Legislation" over land acquired from a state for the "Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings...." While Respondent's argument that ADMAX qualifies as a federal enclave is plausible, he has not cited any authority demonstrating that the United States exercises *exclusive* federal jurisdiction over ADMAX. Nevertheless, the PDJ assumes for the sake of argument here that ADMAX is a federal enclave. *But see Roll v. Tracor, Inc.,* 140 F.Supp.2d 1073, 1078 (D.Nev.2001) (finding that a portion of Nellis Air Force Base in Nevada was not under exclusive federal jurisdiction and accordingly was not a "federal enclave").

13. *Bd. of County Comm'rs of Arapahoe County v. Donoho,* 144 Colo. 321, 332, 356 P.2d 267, 273 (1960).

14. *Id.* at 332, 273–74.

15. *Id.* at 327, 270–71.

16. *See State ex rel. Children, Youth & Families Dep't v. Debbie F.,* 120 N.M. 665, 905 P.2d 205, 207–08 (App.1995) (holding that the State of New Mexico could protect children living on federal enclaves from abuse and neglect under the authority of the New Mexico Children's Code).

17. *See id.; Howard v. Cmm'rs of Sinking Fund of City of Louisville,* 344 U.S. 624, 627, 73 S.Ct. 465, 97 L.Ed. 617 (1953) ("The fiction of a state within a state can have no validity to prevent the

Here, applying state disciplinary rules to representation of an ADMAX inmate poses no apparent conflict with federal jurisdiction. The regulation of attorney conduct is a matter of state sovereignty,[18] and no federal code of attorney conduct exists. As such, the Colorado Rules of Professional Conduct do not conflict with federal laws or regulations. Moreover, if lawyers counseling inmates in federal prisons were not bound by the disciplinary rules of the surrounding state, a dangerous vacuum of attorney oversight would form.[19] Accordingly, the fact that Allen is incarcerated in a federal facility does not alter the PDJ's conclusion that the PDJ and the Hearing Board have jurisdiction over this matter and that application of Colorado's disciplinary rules is appropriate here.

### First Order Entering Partial Judgment on Pleadings

■ As noted above, the People initially sought partial judgment on the pleadings as to Colo. RPC 8.4(c), which provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. A lawyer knowingly misappropriates client funds and thus violates Colo. RPC 8.4(c) by taking client funds entrusted to him, knowing the client has not authorized such a taking.[20] Intent to permanently deprive a client of funds is not a necessary element of the rule,[21] but the element of scienter must be shown.[22]

■ Under Colorado law, a lawyer does not earn advance funds, including "advance fees" or "flat fees," upon receipt.[23] Rather, "an attorney earns fees only by conferring a benefit on or performing a legal service for the client."[24] Only under narrow circumstances embodied in an "engagement" or "general" retainer may an attorney earn a fee upon receipt. Under this type of retainer, the attorney earns a fee either by consenting to forgo other possible employment

state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government."); *Cobb v. Cobb*, 406 Mass. 21, 545 N.E.2d 1161, 1164 (1989) (holding that a state court had authority to apply a restraining order within the boundaries of a military reservation because the order did not appear to interfere with federal "function"); *In re Terry Y.*, 101 Cal.App.3d 178, 161 Cal.Rptr. 452, 452–53 (1980) (holding that a state court had jurisdiction to remove a physically abused child from the custody of his parents, even though the child resided on Ford Ord, a federal enclave, because the state court's exercise of jurisdiction did not conflict with federal sovereignty); *see generally* Michael J. Malinowski, *Federal Enclaves and Local Law: Carving Out a Domestic Violence Exception to Exclusive Legislative Jurisdiction*, 100 YALE L.J. 189, 195 (Oct. 1990) (describing the prevalent approach to determining which state laws apply on federal enclaves as "dictat[ing] that all state laws are valid within federal enclaves unless they interfere with the jurisdiction asserted by the federal government"). We note that, under an older approach, courts upheld application of state law on federal enclaves only where the state law had been in force at the time of the state's transfer of land to the federal government. *See, e.g., Chicago, R.I. & P. Ry. v. McGlinn*, 114 U.S. 542, 547, 5 S.Ct. 1005, 29 L.Ed. 270 (1885).

18. *A.L.L. v. People*, 226 P.3d 1054, 1057 (Colo. 2010) (noting that "within the boundaries of due process and equal protection, the details of attorney regulations are left to a state's sovereign

control") (citing *Hoover v. Ronwin*, 466 U.S. 558, 569 n. 18, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) (stating that "regulation of the bar is a sovereign function of the [state]" because "[f]ew other professions are as close to the core of the [s]tate's power to protect the public ... [or] as essential to the primary governmental function of administering justice") (internal quotations and citations omitted)).

19. *See In re Terry Y.*, 161 Cal.Rptr. at 454 (noting that if the county encircling Fort Ord did not protect children living at Fort Ord from abuse, those children could be left without any governmental protection).

20. *In re Haines*, 177 P.3d 1239, 1245 (Colo. 2008).

21. *People v. Varallo*, 913 P.2d 1, 10–11 (Colo. 1996) (citing *People v. Marsh*, 908 P.2d 1115, 1119 (Colo.1996)).

22. *People v. Rader*, 822 P.2d 950, 953 (Colo. 1992). "[T]he element of scienter is shown with respect to a violation of [the predecessor to Colo. RPC 8.4(c)] when it is established that the attorney deliberately closed his eyes to facts he had a duty to see or recklessly stated as facts things of which he was ignorant." *Id.* (internal quotation omitted).

23. *In re Sather*, 3 P.3d 403, 410–11 (Colo.2000).

24. *Id.* at 410.

opportunities, by agreeing to make the client's work a top priority, or by virtue of the attorney's unavailability to represent an opposing party.[25] Unless a fee agreement explicitly designates an engagement retainer as such and explains that the retainer is earned upon receipt, it is presumed that an advance fee is a deposit that is not earned upon receipt.[26]

In this matter, Respondent has not made any assertions to rebut the presumption under Colorado law that Allen's $30,000.00 retainer was an advance payment of fees. The evidence shows that the retainer was not an "engagement retainer" but rather that it was designed to compensate Respondent for future legal services. As such, the retainer belonged to Allen or Allen's mother until such time as Respondent earned the legal fees. Respondent admits he did not earn the entire $30,000.00 retainer and that he "exercised dominion or ownership over ... funds held for Allen's benefit." Although Respondent denies he lacked Allen's permission to use the funds for his personal purposes, he only denies that allegation on the basis that he did not believe he required such permission.

Moreover, given Respondent's admission that he "knew" he owed Allen or Allen's mother at least $9,687.00 for the purposes of accounting, the requisite mental state for a violation of Colo. RPC 8.4(c) has been demonstrated here. The evidence shows that Respondent knew he was using Allen's retainer for his own purposes before having performed $30,000.00 of legal services. It is not necessary to establish that Respondent knew Colorado law did not authorize him to use the retainer for his own purposes.[27] In accordance with the foregoing analysis and the standards provided in C.R.C.P. 12(c), the PDJ determined as a matter of law that Respondent exercised unauthorized dominion over Allen's retainer in contravention of Colo. RPC 8.4(c).

▬▬ The PDJ also observed that Texas law appears to accord with Colorado law as to how an attorney earns a flat fee. Under Texas law, a non-excessive "true" retainer that functions "to secure a lawyer's services, and remunerate him for loss of the opportunity to accept other employment" is earned at the moment it is received, "[i]f the lawyer can substantiate that other employment will probably be lost by obligating himself to represent the client...."[28] But "[i]f a fee is not paid to secure the lawyer's availability and to compensate him for lost opportunities, then it is a prepayment for services."[29] In Texas, such a prepayment "belongs to the client until the services are rendered and must be held in a trust account."[30] Here, the evidence shows that Allen's retainer was not a "true" retainer that was earned upon receipt, but rather was an advance payment

---

25. *Id.*

26. *Id.* at 410–11.

27. *See People v. Holmes*, 959 P.2d 406, 414 (Colo. 1998) ("Generally speaking, where the law imposes criminal liability for certain conduct, the scienter element requires no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.") (internal quotation omitted); C.R.S. § 18–1–504 ("A person is not relieved of criminal liability for conduct because he engages in that conduct under a mistaken belief that it does not, as a matter of law, constitute an offense."). The case and statute cited above directly concern criminal liability, but we also find them relevant to attorney disciplinary proceedings, particularly in light of the Colorado Supreme Court's finding that higher standards for conduct may be imposed upon lawyers than upon lay persons. *See People v. Morley*, 725 P.2d 510, 516 n. 2 (Colo.1986).

28. Tex. Comm'n on Prof'l Ethics, Op. 431, V. 49 TEX. B.J. 1084 (June 1986); *Cluck v. Comm'n for Lawyer Discipline*, 214 S.W.3d 736, 739–40 (Tex. App.2007) (citing and quoting Tex. Comm'n on Prof'l Ethics, Op. 431). Even if a retainer is a "true" retainer that is deemed earned upon receipt, the attorney must "promptly refund an equitable portion of the retainer" if the client discharges the attorney for cause or the attorney voluntarily withdraws from representation before having lost other employment opportunities. Tex. Comm'n on Prof'l Ethics, Op. 431.

29. *Cluck*, 214 S.W.3d at 740.

30. *Id.* (citing Tex. Disciplinary R. Prof'l Conduct 1.14 cmt. 2). We note that Texas law appears to treat a lawyer's unauthorized consumption of unearned advance legal fees as a violation of Texas Disciplinary Rule of Professional Conduct 1.15(d) (declining or terminating representation), rather than as dishonest conduct.

that Respondent did not earn upon receipt under Texas law.

### Second Order Entering Partial Judgment on Pleadings

█ In an order dated May 18, 2011, the PDJ concluded that the factual findings and legal determinations made in his March 9, 2011, order granting partial judgment on the pleadings also established that Respondent violated Colo. RPC 1.15(b) and 1.16(d). Colo. RPC 1.15(b) requires a lawyer who has received funds in which a client or a third party has an interest to deliver to that person, promptly or as otherwise permitted by law or agreement, any funds he or she is entitled to receive. The PDJ's March 9, 2011, order granting partial judgment as to Colo. RPC 8.4(c) established that (1) Respondent received an advance fee in which Allen or Allen's mother had an interest, (2) Respondent had not delivered those funds to Allen or Allen's mother, and (3) Allen or Allen's mother was entitled to receive at least $9,687.00 of those funds. Therefore, the PDJ determined in his May 18, 2011, order that Respondent had violated Colo. RPC 1.15(b).

Colo. RPC 1.16(d) provides that, "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests," including "refunding any advance payment of fee or expense that has not been earned or incurred." The PDJ's order of March 9, 2011, establishes that (1) Respondent's representation of Allen terminated when Respondent's suspension took effect on April 22, 2010, (2) Respondent had not refunded the advance fee he received for the representation, and (3) Respondent had not earned at least $9,687.00 of that advance fee. Accordingly, the PDJ concluded in his May 18, 2011, order that Respondent also had violated Colo. RPC 1.16(d).

### IV. SANCTIONS

█ The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards*") and Colorado Supreme Court case law govern the selection and imposition of sanctions for lawyer misconduct. ABA *Standard* 3.0 mandates that, in selecting the appropriate sanction, the Hearing Board consider the duty breached, the injury or potential injury caused, Respondent's mental state, and the aggravating and mitigating evidence.

### ABA *Standard* 3.0—Duty, Injury, and Mental State

*Duty:* By using Allen's retainer for his own purposes without authorization and by failing to return funds that did not belong to him, Respondent breached the duties of loyalty and honesty that he owed to his client. Respondent also neglected the duties he owed as a professional by failing to protect Allen's interests upon termination of the representation.

*Injury:* Joan Allen testified by telephone that the retainer she gave Respondent represented her "life savings," which she needs to pay for nursing home care in the near future. In addition, Joan Allen lost interest on those funds and the Allens incurred costs in notifying the authorities of Respondent's misconduct. Respondent's failure to return unearned funds thus has caused serious injury. On a less tangible level, Allen testified that he has suffered "extreme" emotional harm as a result of Respondent's misconduct. According to Allen, Respondent's neglect of his case and breach of promises exacerbated his bipolar disorder. In a similar vein, Joan Allen said it has been hard for her to accept that someone she had judged to be honest, honorable, and trustworthy betrayed her trust. Finally, Respondent's misconduct calls the legal profession into disrepute, as indicated by Allen's testimony that he will never again hire a lawyer.

*Mental State:* As noted in the PDJ's motion granting partial judgment as to Colo. RPC 8.4(c), Respondent admitted in his answer that he "knew" he owed Allen or Allen's mother at least $9,687.00. Yet he exercised dominion or ownership over those funds held for Allen's benefit. The Hearing Board finds that Respondent's admissions also indicate he engaged in knowing violations of Colo. RPC 1.15(b) and 1.16(d).

**ABA *Standard* 3.0—Aggravating Factors**

Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. The Hearing Board considers evidence of the following aggravating circumstances in deciding the appropriate sanction.

*Prior Disciplinary Offenses—9.22(a):* The People presented evidence of extensive discipline imposed upon Respondent in multiple jurisdictions:

- On November 23, 2004, the State Bar of Texas imposed upon Respondent an agreed judgment of private reprimand for neglect of a legal matter and charging or collecting an illegal or unconscionable fee.

- On October 12, 2005, the State Bar of Texas imposed upon Respondent an agreed judgment of private reprimand for failing to keep a client reasonably informed and failing to explain a matter to a client.

- On October 31, 2007, the State Bar of Texas publicly reprimanded Respondent and ordered him to pay restitution of $10,000.00 for failing to carry out obligations owed to a client, failing to keep a client reasonably informed, and failing to refund unearned fees.

- On October 31, 2007, in a separate client matter, the State Bar of Texas publicly reprimanded Respondent and ordered him to pay restitution of $1,000.00 for failing to keep a client reasonably informed, failing to explain a matter to a client, and failing to refund unearned fees.

- On August 28, 2009, the State Bar of Texas suspended Respondent for a year and ordered him to pay restitution of $2,500.00 for neglecting a legal matter and failing to refund unearned fees.

- On December 29, 2009, the State Bar of Texas suspended Respondent for five years, with three years of the suspension stayed, and ordered him to pay restitution of $40,120.00 for neglecting a client matter, failing to keep a client reasonably informed, and failing to refund unearned fees. The discipline concerned misconduct in ten client matters.

- On April 6, 2011, the Supreme Court of North Dakota barred Respondent from practice in North Dakota and ordered him to pay restitution for misconduct involving lack of competence and diligence, inadequate communication, charging an unreasonable fee, and failing to return unearned fees.

- On April 22, 2011, the Colorado Supreme Court suspended Respondent for two years. This reciprocal discipline was premised upon Respondent's five-year suspension by the State Bar of Texas.

*Dishonest or Selfish Motive—9.22(b):* The Hearing Board finds that Respondent acted selfishly by using Allen's retainer for his own purposes without having fully earned it.

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g):* Although Respondent briefly commented that he felt "ashamed" of his conduct, the general tenor of his testimony reflected a lack of remorse for his actions. Respondent demonstrated neither a recognition of his obligation to learn the Colorado Rules of Professional Conduct nor an awareness of the impact his misconduct had on his client and his client's mother. In addition, Respondent refuses to recognize that an advance payment of fees is not earned upon receipt under Texas law. Finally, Respondent did not acknowledge to the Hearing Board that his August 8, 2008, letter to Allen misrepresented his level of legal experience in Colorado.

*Vulnerability of Victim—9.22(h):* Allen had limited access to legal services and restricted earning capacity as a prison inmate, and he relied upon Respondent to assist him with a legal matter of immense importance to him. In addition, Allen's mother, who is in her 70s, testified that she spent her "life savings" on Respondent's retainer.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was licensed to practice law in Texas in 1970 and in Colorado in 1980. This lengthy experience in the practice of law should have instilled in Respondent an understanding of his professional

obligations and a commitment to upholding those duties.

### ABA *Standard* 3.0—Mitigating Factors

Mitigating factors are any considerations or factors that may justify a reduction in the degree of discipline imposed. The Hearing Board considers the following mitigating circumstance in deciding the appropriate sanction.

*Personal or Emotional Problems—9.32(c):* The Hearing Board views Respondent's recent personal and emotional difficulties as a mitigating factor. Respondent's mother died in 2006, and the following year his brother also passed away. Respondent declared bankruptcy around the same time, and his home was foreclosed upon about a year ago. Although Respondent sought assistance from the Texas lawyers' assistance program in 2010 and started seeing a psychologist, he suffered a nervous breakdown in January 2011. Respondent believes that the breakdown resulted from the cumulative effect of his separation from his wife and other stressors. During at least one period, Respondent was despondent and felt unable to work. Respondent testified that these problems explain his failure to fully cooperate with the People in the course of this disciplinary process.

### Sanctions Analysis under ABA *Standards* and Case Law

 As noted above, the PDJ already determined as a matter of law, based upon Respondent's admissions, that Respondent knowingly violated Colo. RPC 8.4(c). ABA *Standard* 4.11 and Colorado case law make clear that the presumptive sanction for knowing misappropriation of client funds is disbarment.[31] For example, in *People v. Torpy,* the Colorado Supreme Court disbarred a lawyer who knowingly misappropriated $9,000.00 from his clients, overruling a hearing board's recommendation of a three-year suspension.[32]

Even though the lawyer had misappropriated client funds in just one instance and several mitigating factors applied, the court deemed disbarment the appropriate sanction, commenting that "to allow deviation [from the presumption of disbarment for knowing misappropriation of client funds] without an extraordinary reason to do so would create uncertainty and inevitably lead to even less equitable results than adherence to the rule would." [33] Here, aggravating factors far outweigh mitigating factors, making disbarment the mandatory sanction.

The Hearing Board also notes that, even were a Colo. RPC 8.4(c) violation not present here, Respondent's transgressions of Colo. RPC 1.15(b) and 1.16(d) would merit disbarment in light of the applicable aggravating factors. Although suspension is the baseline sanction for Respondent's violations of Colo. RPC 1.15(b) and 1.16(d) pursuant to ABA *Standards* 4.12 and 7.2, ABA *Standard* 8.1(b) provides that disbarment is generally appropriate when a lawyer has been suspended for the same or similar misconduct and knowingly engages in further misconduct that causes injury to a client. Here, the State Bar of Texas publicly reprimanded Respondent twice in 2007 for failing to refund unearned fees, suspended him in August 2009 for the same infraction, and once again suspended him in December 2009 for similar rule violations in multiple client matters. Yet in 2010, Respondent failed anew to refund client fees in Allen's matter. The balance of aggravating and mitigating circumstances presented in this case bolsters our conclusion that disbarment is the appropriate sanction.

### V. *CONCLUSION*

In this matter, Respondent breached his professional duties by failing to return unearned client funds. Respondent violated Colo. RPC 1.15(b), 1.16(d), and 8.4(c) when he used a client's $30,000.00 retainer for his

---

31. *People v. Lavenhar,* 934 P.2d 1355, 1359 (Colo.1997) ("We have repeatedly held that a lawyer's knowing misappropriation of funds, whether belonging to a client or third party, warrants disbarment except in the presence of extraordinary factors of mitigation.") (citing *People v. Mundis,* 929 P.2d 1327, 1331 (Colo.1996);

*People v. Motsenbocker,* 926 P.2d 576, 577 (Colo. 1996); ABA *Standard* 4.11).

32. 966 P.2d 1040, 1046 (Colo.1998).

33. *Id.* at 1044–46.

own purposes without authorization and without having earned the retainer. Given the serious nature of Respondent's misconduct, his lengthy disciplinary record in Texas for similar misconduct, and the substantial risk he presents to the public, we find that disbarment is warranted.

### VI. *ORDER*

The Hearing Board therefore **ORDERS:**

1. **STEVEN J. ROZAN,** attorney registration number 10381, is **DISBARRED.** The **DISBARMENT SHALL** take effect only upon issuance of an "Order and Notice of Disbarment." [34]

2. Respondent **SHALL** file any post-hearing motion or application for stay pending appeal with the PDJ **on or before September 15, 2011.** No extensions of time will be granted. If Respondent files a post-hearing motion or an application for stay pending appeal, the People **SHALL** file any response thereto within five days, unless otherwise ordered by the PDJ.

3. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a "Statement of Costs" within fifteen days from the date of this order. In that statement, the People should indicate whether they seek an award of restitution in this matter and, if so, in what amount. The Hearing Board encourages the People to request restitution if the information available to the People supports such a request. Respondent must submit any response to the People's statement within ten days.

---

**34.** In general, an order and notice of sanction will issue thirty-one days after a decision is issued pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-one days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.